## NATIONAL BANK v. INSURANCE COMPANY.

1. Although the relation between a bank and its depositor is that merely of debtor and creditor, the money which he deposits, if held by him in a fiduciary capacity, does not change its character by being placed to his credit in his bank account.

2. The bank contracts that it will pay the money on his checks, and, when they are drawn in proper form, it is bound to presume, in case the account is kept with him as a trustee, or as acting in some other fiduciary character, that he is in the course of lawfully performing his duty, and to honor them accordingly; but when against such an account it seeks to assert its lien for an obligation which it knows was incurred for his private benefit, it must be held as having notice that the fund is not his individual property, if it is shown to consist, in whole or in part, of money which he held in a trust relation.

3. As long as trust property can be traced and followed, the property into which it has been converted remains subject to the trust; and, if a man mixes trust funds with his, the whole will be treated as trust property, except so far as he may be able to distinguish what is his. This doctrine applies in every case of a trust relation, and as well to moneys deposited in bank, and to the debt thereby created, as to every other description of property.

4. A banker's lien on the securities and money deposited in the usual course of business, for advances which are supposed to be made upon their credit, ordinarily attaches not only against the customer, but against the unknown equities of all others in interest, unless it be modified or waived by some agreement, express or implied, or by conduct inconsistent with its assertion; but it cannot prevail against the equity of the beneficial owner, of which the banker has either actual or constructive notice.

5. When a bank account was opened in the name of a depositor, as general agent, and it was known to the bank that he was the agent of an insurance company; that conducting its agency was his chief business; that the account was opened to facilitate that business, and used as a means of accumulating the premiums on policies collected by him for the company, and of making payment to it by checks, — the bank is chargeable with notice of the equitable rights of the company, although he deposited other money in the same account and drew checks upon it for his private use. The company may enforce, by bill in equity, its beneficial ownership therein against the bank, claiming a lien thereon for a debt due to it, which he contracted for his individual use.

6. A national bank, in voluntary liquidation under sect. 5220 of the Revised Statutes, is not thereby dissolved as a corporation, but may sue and be sued, by name, for the purpose of winding up its business; and it is no defence to a suit upon a disputed claim that, under sect. 2 of the act of June 30, 1876, c. 156 (19 Stat. 63), the plaintiff has also filed a creditor's bill to enforce the individual liability of the shareholders.

7. A plea in equity may be disregarded, if it alleges mere conclusions of law, or lacks the affidavit and certificate required by the thirty-first equity rule.

8. When an equity cause was heard upon bill, answer, and proofs, the want of a formal replication cannot, on appeal, be assigned for error.

APPEAL from the Circuit Court of the United States for the District of Maryland.

The Connecticut Mutual Life Insurance Company of Hartford, in the year 1864, appointed A. H. Dillon, Jr., its general agent for the territory consisting of the States of Maryland, Delaware, West Virginia, and the District of Columbia. He opened an office at No. 8 South Street, Baltimore, conspicuously designated by signs as his place of business as general agent of the Connecticut Mutual Life Insurance Company. It was his duty, among others, to collect and receive premiums on policies issued by the company, from persons residing within his territory, and remit the same to the company at Hartford. This he usually did twice a month, finally accounting for the business of each month at its close. The mode of remitting was by checks upon a Baltimore bank to the order of the secretary

of the company. To this end he at first opened an account with John S. Gittings & Co., transferred afterwards to the Chesapeake Bank, and on April 1, 1871, to the appellant, a national bank, then recently organized, whose banking-house was across the street from his office. The account was designated on its books as follows : " Dr. Central National Bank in account with A. H. Dillon, Jr., gen'l ag't.  Cr." To the credit of this account he deposited from time to time premiums collected for the insurance company, and remitted twice a month his checks, signed by him as general agent, and payable to the order of Jacob L. Greene, secretary of the appellee. When the premiums were paid by the checks of others, they were indorsed by him as general agent, and deposited to the credit of this account. In such instances an indorsement in this form was required by the bank. Dillon also deposited to the credit of this account, from time to time, various amounts of money received by him from other sources than from premiums belonging to the appellee, and drew upon this account checks for money applied and paid to his own use. The aggregate of the deposits made, as shown in this account, from the beginning till it was closed, amount to $470,753.05. There were drawn against it, in all, four hundred and eleven checks, of which sixty-eight were on their face payable to the order of Greene as secretary of the appellee, representing, however, much the larger part of the gross sum of the deposits.

On June 12, 1874, this account was finally closed, with a balance, as between deposits and checks, of $11,000.86. At that date Dillon owed an amount larger than this to the insurance company, and the proof is clear that the whole balance then shown by the account, as above stated, was the proceeds of collections of premiums made by him as its agent.

His current deposits of premiums in this account included his own commissions as agent.

Before opening this account with the Central National Bank, on March 9, 1871, Dillon had opened another account with it, in the name of his wife, Mrs. A. P. Dillon. This account was kept open until May 1, 1873, which is the date

of the last entries, when it was balanced and closed. The deposits to the credit of this account were made by Dillon, and the checks were drawn by him in his wife's name. All the transactions represented in it were for his individual account. On both these accounts Dillon was, by agreement with the bank, allowed interest, which he collected for his individual use.

On March 14, 1872, Dillon was in distress for money to make good his margins on some speculations in stock, and applied to O'Connor, the president of the bank, for a loan. He explained the nature, extent, and cause of his necessity to O'Connor, who, indeed, was already aware that he was in the practice of stock speculation, having been interested with him in some ventures of that character. O'Connor testifies that he declined making the loan without security, when Dillon proposed his wife as security for the amount required, not to exceed $12,000, to be drawn upon checks in her name, which, if not made good in a few days, were to be taken up by a note signed by her, assuring O'Connor that certain real estate owned by her where they resided in Baltimore, with its furniture, was worth at least $15,000 or $20,000. He also urged, says O'Connor, that he kept a valuable account with the bank, and as he had never asked before for any loan, he thought he was entitled to it. The reference, doubtless, was to his agency account.

The loan was made, the money being paid by the bank on checks drawn in the name of Alice P. Dillon, to the amount of $13,000, on March 14, 15, and 16, 1872. These checks were debited to the bank account in her name, and constituted an overdraft of $12,067.14. On April 2, 1872, the bank discounted Mrs. Dillon's note for $12,000, and carried the proceeds to the credit of this account, in order to change the form of the debt. This note was renewed from time to time, the interest being paid in some instances by Dillon's check as general agent, charged to the account kept by him in that name. It was reduced at one time by a payment of $2,000, paid in money. It was then carried in the same way until Dec. 11, 1873, when the note of Mrs. Dillon for $10,000 was given, dated Nov. 29, 1873, at six months, falling due June 1, 1874. This note was

signed by Dillon and his wife, in their own handwriting, both as makers and indorsers. The discount upon it, and the interest accrued on the prior note, overdue for some time, of which it was the renewal, making in all $333.34, was paid to the bank by Dillon's check as general agent. The account in the name of Mrs. Dillon was balanced on May 1, 1873, by two entries of $12,000 each, representing the debt as it then stood; and that account was closed. The note thereafter appeared only in the discount ledger, until it was charged up, as hereafter stated. It was expressed to be payable at the Central National Bank of Baltimore. The same day this note was given, Nov. 29, 1873, an agreement was made in writing between the bank, by resolution of the directors, and Dillon and his wife, " that in consideration of Alice P. Dillon being a stockholder in this bank, and of A. H. Dillon, Jr., being a customer of the bank, their note for $10,000, dated November 29th, 1873, at six months, be discounted at 6 per c. per annum, provided only that it be agreed in writing between the makers and indorsers of said note and the bank, that at the maturity of the note $5,000 must be paid, and a new note at 6 months, to be discounted at 6 per c., which at its maturity must be paid in full, being in full payment of the loan."

In addition to these two accounts there was a third, entitled on the books of the bank, " A. H. Dillon, Jr.," spoken of in the testimony as his individual account. The first entry is dated Oct. 15, 1873, the last, Dec. 11, 1873. There are eight items on each side, amounting to $28,337.50. In the first three items it is testified that Dillon had no interest at all. They represent transactions made by him for the bank itself. The last item in the account is $10,000, being proceeds of his note discounted, which were used to take up a prior one, then matured.

On June 1, 1874, the note given by Dillon and his wife for $10,000, dated Nov. 29, 1873, at six months, became due and was not paid. By order of the bank it was that day charged to Dillon in his account as general agent. In ignorance of that fact, he continued to make deposits in that account and draw checks upon it till June 12, 1874, when it was closed, showing

a credit balance at that date, if the note of $10,000 was not properly chargeable, of $11,000.86.

On June 10, 1874, Dillon drew his check as general agent on the bank for $8,000 to the order of Greene, the secretary of the insurance company, and remitted it to him at Hartford. On June 13 it was presented to the bank for payment, and payment refused, on the ground that there were not funds to the credit of the drawee sufficient to pay it.

In the settlement of his agency accounts with the company for May and June, 1874, he was allowed a credit for the amount of this balance in the Central Bank, $11,000.86, and paid in addition, in full of his account to June 30, $4,550.66.

On June 11 the directors of the bank, by resolution, recite the agreement made in respect to the $10,000 note, on Nov. 29, 1873, when it was discounted; that it had not been complied with; that the note was made payable at the bank; and declare that " this board approve of the act of the acting cashier in charging said note in full to the account and funds of A. H. Dillon, Jr., general agent," &c.

On July 18, 1874, the insurance company filed a bill in equity in the Circuit Court of Baltimore City against the bank to recover the balance, which it alleged remained in the account of A. H. Dillon, Jr., general agent, $11,000.86, claiming it to be a fund, received by him in his fiduciary character, as its agent, which they had a right to follow and reclaim as against the bank.

To this bill the bank appeared and answered, denying its equity.

The insurance company filed an amended bill on March 4, 1875, in which it repeated the allegations of the original bill, and further averred that the defendant bank had taken proceedings under the National Bank Act to wind up its business and cease to act as a national bank in the city of Baltimore, and that if it be permitted to do so, distributing its assets among its stockholders, the complainant will have no remedy except by a multiplicity of suits against individual stockholders, many of whom are not within the jurisdiction. It therefore prays, in addition to an account and a declaration that the

fund in question is a trust fund, of which the complainant is beneficial owner, that an injunction may be granted restraining the bank from paying to its stockholders its assets without retaining a sufficient amount to satisfy the complainant's demand.

To the amended bill the defendant filed what are designated as pleas, as follows : —

1. That the plaintiff is not in any sense a creditor of the defendant.

2. That there never was nor is any privity between the plaintiff and the defendant as to the various matters alleged in the bill.

3. That the court had no jurisdiction as to the matters alleged, the remedy, if any, being complete and adequate at law.

And afterwards an additional plea : —

4. That under the provisions of the acts of Congress, in reference to national banks, it is exempted from the process of injunction as prayed for.

By the amended bill A. H. Dillon, Jr., was made a party defendant. He appeared and filed his answer to the original and amended bill ; but, having been lost or mislaid, it is not contained in the transcript of the record.

Subsequently, on April 10, 1877, the cause was removed from the State court to the Circuit Court of the United States, on the petition of the defendant, the Central National Bank.

The bank, on May 23, 1878, filed a motion to dismiss the bill, on the grounds : —

1. That the bank, by a vote of its shareholders, owning two thirds of its stock, taken July 15, 1874, had gone into liquidation, in pursuance of sects. 5220, 5221, and 5222 of the Revised Statutes, and had thereby become dissolved.

2. And that the complainant, on June 8, 1878, had filed in the Circuit Court of the United States its bill of complaint, by virtue of sect. 2, c. 156, of an act of Congress approved June 30, 1876, entitled " An Act authorizing the appointment of receivers of national banks, and for other purposes," praying process against said bank and against the persons who

were shareholders thereof at the time the same went into voluntary liquidation, and seeking the enforcement of the same demand sought to be enforced in this case, which is still pending.

This motion was overruled. The cause having been set down for hearing, the complainant moved for leave to file a general replication to the original answer, *nunc pro tunc*, and also to file a replication to defendant's first plea, which motions were granted; and to deny the legal sufficiency of the defendant's 2d and 3d pleas, setting the said two pleas for argument, which was overruled.

The motion to dismiss the bill, on the ground that the bank had gone into liquidation and was thereby dissolved, was renewed on June 10, 1878, with the additional averment, that in the mean time all its property and assets had been distributed among its shareholders, and that the bank was wholly and finally closed, and had ceased to have a corporate existence. This motion was overruled as having been filed after the cause had been argued and submitted, and after the court had orally pronounced its opinion.

And on the same day a decree was passed reciting that the cause standing ready for hearing, and having been argued, and submitted upon the bill, answer, pleadings, and other proceedings and evidence in the cause, and decreeing payment by the bank to the complainant of the amount of the fund claimed, with interest.

From this decree the bank prosecutes this appeal.

*Mr. Arthur W. Machen* for the appellant.
*Mr. John Carson, contra.*

MR. JUSTICE MATTHEWS, after making the foregoing statement of facts, delivered the opinion of the court.

The contention of the appellant, in opposition to the decree below, upon the merits, is that the account of A. H. Dillon, Jr., general agent, with the bank was an individual account with him as a depositor, which created the relation of debtor and creditor between them, and to which no other party was or could be privy; that the style in which it was kept, of general agent, was merely a *descriptio personæ*, and furnished no

indication that the money deposited belonged to the depositor in any fiduciary capacity; that it described merely the business in which he was engaged, as that of a general agency, for whomsoever might employ him; that in point of fact the account embraced deposits from various sources, and was used as a medium for payments of every description, according to the will of the depositor; that the bank had no notice of any equitable claim of the complainant, nor of the facts on which its claim rests; that, consequently, it had the right to treat the account as a dealing with Dillon individually, in which, so far as the bank was concerned, no one else had any interest, legally or equitably, and subject to its lien as a banker, for any overdue obligation of the depositor.

It is claimed further, in support of the bank's position, that the discount of the note afterwards charged to this account was made originally upon the faith and credit that the latter was Dillon's individual property. But this we find to be distinctly and fully negatived by the circumstances in proof. There was a considerable balance to the credit of this account when the original debt was contracted, and at each time when it was renewed; but at no time does it appear that the suggestion was made that it should be applied, in whole or in part, to pay or reduce the indebtedness. The debt was first charged in the account kept in the name of Mrs. Dillon, and never appeared in the other, till it was finally charged up for payment. In the original conversation that resulted in the agreement for the loan, O'Connor, the president of the bank, demanded security, and was satisfied with the responsibility of Mrs. Dillon, as the supposed owner of their residence in Baltimore, and it was not until after O'Connor learned that this had been conveyed to another that he conceived the idea of charging the note, when it should become due, if it remained unpaid, to the account of Dillon, as general agent. The existence of this account as a profitable one to the bank was alleged as a reason by Dillon why he should have the accommodation; but it was not pledged for the payment of the loan, either in express terms, or by any acts or conduct from which such an intention can be inferred. And no such claim is made by the directors of the bank, either in their resolution of Nov. 29,

1873, authorizing the discount of the last six-months note, or that of June 11, 1874; justifying the act of the cashier in finally charging it up to the account of Dillon, as general agent.

We find it also to be fully proven that the bank knew that Dillon was the agent for the insurance company; that it was his business and duty to collect and remit to it the premiums on policies of life insurance as they accrued; that the bank account in his name as general agent was opened in that way to be used for that purpose; that in point of fact such premiums were collected and deposited for accumulation to be remitted, and were remitted by checks on that account, and that they constituted much the larger part of the fund which entered into it.

It will be observed that the question arising here is not what the rights of the parties would be if the note had been taken up by Dillon's check upon that account, the bank having no knowledge of its character, except what might be inferred from the use of the words "general agent" at its head. Here the attempt is made, with the actual knowledge which we find imputable to the bank, and without Dillon's assent, to pay itself his overdue note out of a fund for which, as agent of the insurance company, he was bound to account to it. In the case of *Duncan* v. *Jaudon* (15 Wall. 165), this court decided that a banker lending money to a person, for his private use, on the security of stocks, the certificates of which showed that he held them as trustee for another, was chargeable, as a party to the breach of trust, for the value of the trust property converted, and cited with approbation the similar decision in *Shaw* v. *Spencer* (100 Mass. 382), where the certificates were in the name of " A. B., trustee," without naming a *cestui que trust*. In that case it was held that the pledgee is, by the terms of the certificate, put on inquiry as to the character and limitations of the trust, and if he accepts the pledge without inquiry, does so at his peril.

A bank account, it is true, even when it is a trust fund, and designated as such by being kept in the name of the depositor *as trustee*, differs from other trust funds which are permanently invested in the name of trustees for the sake of being

held as such; for a bank account is made to be checked against, and represents a series of current transactions. The contract between the bank and the depositor is that the former will pay according to the checks of the latter, and when drawn in proper form the bank is bound to presume that the trustee is in the course of lawfully performing his duty, and to honor them accordingly. But when against a bank account, designated as one kept by the depositor in a fiduciary character, the bank seeks to assert its lien as a banker for a personal obligation of the depositor, known to have been contracted for his private benefit, it must be held as having notice that the fund represented by the account is not the individual property of the depositor, if it is shown to consist, in whole or in part, of funds held by him in a trust relation.

In such circumstances it is merely an application of the principle of set-off, and is illustrated by the case of *Bailey* v. *Finch*, Law Rep. 7 Q. B. 34. There the plaintiff, as trustee of a bankrupt banking firm, sought to recover a balance of a banking account which had been overdrawn. The defendant sought to set off a balance due to him as executor of A., in which name he had another account, and proved that as residuary legatee he was beneficially entitled to this balance, the legatees being otherwise satisfied. It was held that the effect of the account being in the name of the executor was to affect the bank with notice, if there were any equities attaching to the fund, but that under the circumstances there were no such equities as to prevent the defendant from treating the balance as a fund to which he was beneficially as well as legally entitled, and that consequently he was entitled to set it against the plaintiff's claim. Cockburn, C. J., said: "There can be no doubt that in point of law the estate and effects of the deceased testatrix passed to the defendant as executor. And although it may be for his convenience to open an account in his own name as executor instead of in his own name as private customer, the whole effect of that is, I apprehend, to affect the bank with the knowledge of the character in which he holds the money. Therefore, if there were persons beneficially interested in that fund, the bank might be liable to be restrained by proceedings in equity from dealing with the fund as if it were one in which

their customer, the defendant, were beneficially interested, absolutely without reference to any trust or beneficial interest to which it was subject." In the same case, Blackburn, J., said, that opening the account as executor operated " as a notice to them, as a statement to the bank — ' This account which I am opening is not my own unlimited property, but it is money which belongs to the estate which I am administering as executor; consequently there may be persons who have equitable claims upon it.' The bank would have been bound by any equity which did exist, of which they had notice at the time the bank became bankrupt."

In the case of *Pannell* v. *Hurley* (2 Col. C. C. 241), the depositor, having two accounts, one in trust, the other in his own name, drew his check as trustee to pay his private debt to the banker. The Vice-Chancellor, Knight Bruce, put the case thus : —

" Money is due from A. to B., in trust for C. B. is indebted to A. on his own account. A., with knowledge of the trust, concurs with B. in setting one debt against the other, which is done without C.'s consent. Can it be a question in equity whether such a transaction stand ? " -

In *Bodenham* v. *Hoskyns* (2 De G., M. & G. 903), the principle was stated to be one, acted upon daily by courts of equity, " according to which a person who knows another to have in his hands or under his control moneys belonging to a third person, cannot deal with those moneys for his own private benefit when the effect of that transaction is the commission of a fraud upon the owner."

In the case of *Ex parte Kingston*, *In re Gross* (Law Rep. 6 Ch. App. 632), a county treasurer had two bank accounts, one headed " Police Account." Some of the items to his credit in this account could be traced as having come from county funds, but most of them could not. The checks which he drew upon it were all headed ." Police Account," and appeared to have been drawn only for county purposes. For the purposes of interest the bank treated the accounts as one account, and the interest on the balance in his favor was carried to the credit of his private account. The manager of the bank knew he was county treasurer, and understood that he had been in the habit

of paying county moneys into the bank. He absconded, his private account being overdrawn, and the police account being in credit. It was held that the bank was not entitled to set off the one account against the other, but that the county magistrates could recover the balance standing to the credit of the police account. Sir W. M. James, L. J., said: " In my mind this case is infinitely stronger than those referred to during the argument, in which a similar claim on the part of bankers was disallowed ; for in those cases the bankers relied on cheques drawn by the customers ; and if a banker receives from a customer holding a trust account a cheque drawn on that account, he is not in general bound to inquire whether that cheque was properly drawn. Here the customer has drawn no cheque, and the bankers are seeking to set off the balance on his private account against the balance in his favor on what they knew to be a trust account."

It is objected that the remedy of the complainant below, if any existed, is at law, and not in equity. But the contract created by the dealings in a bank account is between the depositor and bank alone, without reference to the beneficial ownership of the moneys deposited. No one can sue at law for a breach of that contract, except the parties to it. There was no privity created by it, even upon the facts of the present case, as we have found them, between the bank and the insurance company. The latter would not have been liable to the bank for an overdraft by Dillon, as was decided by this court in *National Bank* v. *Insurance Company*, 103 U. S. 783 ; and, conversely, for the balance due from the bank, no action at law upon the account could be maintained by the insurance company.

But although the relation between the bank and its depositor is that merely of debtor and creditor, and the balance due on the account is only a debt, yet the question is always open, To whom in equity does it beneficially belong? If the money deposited belonged to a third person, and was held by the depositor in a fiduciary capacity, its character is not changed by being placed to his credit in his bank account.

In the case of *Pennell* v. *Deffell* (4 De G., M. & G. 372, 388), Lord Justice Turner said: " It is, I apprehend, an un-

doubted principle of this court, that as between *cestui que trust* and trustee and all parties claiming under the trustee, otherwise than by purchase for valuable consideration without notice, all property belonging to a trust, however much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or in its altered state, continues to be subject to or affected by the trust." In the same case, Lord Justice Knight Bruce said (p. 383) : "When a trustee pays trust money into a bank to his credit, the account being a simple account with himself, not marked or distinguished in any other manner, the debt thus constituted from the bank to him is one which, as long as it remains due, belongs specifically to the trust as much and as effectually as the money so paid would have done, had it specifically been placed by the trustee in a particular repository and so remained ; that is to say, if the specific debt shall be claimed on behalf of the *cestuis que trustent*, it must be deemed specifically theirs, as between the trustee and his executors, and the general creditors after his death on one hand, and the trust on the other." He added (p. 384) : "This state of things would not, I apprehend, be varied by the circumstance of the bank holding also for the trustee, or owing also to him, money in every sense his own."

Vice-Chancellor Sir W. Page Wood, in *Frith* v. *Cartland* (2 Hem. & M. 417, 420), said that *Pennell* v. *Deffell* rested upon and illustrated two established doctrines. One was that "so long as the trust property can be traced and followed into other property into which it has been converted, that remains subject to the trust;". the second is, "that if a man mixes trust funds with his own, the whole will be treated as the trust property, except so far as he may be able to distinguish what is his own."

The case of *Pennell* v. *Deffell* (*supra*) was the subject of comment by Fry, J., in *In re West of England & South Wales District Bank, Ex parte Dale & Co.*, 11 Ch. D. 772. Strongly approving the decision in principle, he felt bound nevertheless, by what he considered the weight of authority, not to apply it, in the circumstances of the case before him, where there had been a mingling of trust money with individual money. He

said, however : " Does it make any difference that, instead of
trustee and *cestui que trust*, it is a case of fiduciary relationship ?
What is a fiduciary relationship ? It is one in which, if a wrong
arise, the same remedy exists against the wrong-doer on behalf
of the principal as would exist against a trustee on behalf of the
*cestui que trust.* If that be a just description of the relation-
ship, it would follow that wherever fiduciary relationship exists,
and money coming from the trust lies in the hands of persons
standing in that relationship, it can be followed and separated
from any money of their own."

The whole subject of this discussion was very elaborately and
with much learning reviewed by the Court of Appeal in
England, in the very recent case of *Knatchbull* v. *Hallett, In re
Hallett's Estate*, 13 Ch. D. 696. It was there decided that if
money held by a person in a fiduciary character, though not as
trustee, has been paid by him to his account at his banker's,
the person for whom he held the money can follow it, and has
a charge on the balance in the banker's hands, although it was
mixed with his own moneys ; and in that particular the court
overruled the opinion in *Ex parte Dale & Co., supra.* It was also
held that the rule in *Clayton's Case* (1 Mer. 572), attributing
the first drawings out to the first payments in, does not apply ;
and that the drawer must be taken to have drawn out his own
money in preference to the trust money ; and in that particular
*Pennell* v. *Deffell* was not followed. The Master of the Rolls,
Sir George Jessel, showed that the modern doctrine of equity,
as regards property disposed of by persons in a fiduciary posi-
tion, is that, whether the disposition of it be rightful or wrong-
ful, the beneficial owner is entitled to the proceeds, whatever
be their form, provided only he can identify them. If they
cannot be identified by reason of the trust money being mingled
with that of the trustee, then the *cestui que trust* is entitled to
a charge upon the new investment to the extent of the trust
money traceable into it ; that there is no distinction between
an express trustee and an agent, or bailee, or collector of rents,
or anybody else in a fiduciary position ; and that there is no
difference between investments in the purchase of lands, or
chattels, or bonds, or loans, or moneys deposited in a bank
account. He adopts the principle of Lord Ellenborough's state-

ment in *Taylor* v. *Plumer* (3 M. & S. 562), that "it makes no difference in reason or law into what other form different from the original the change may have been made, whether it be into that of promissory notes for the security of money which was produced by the sale of the goods of the principal, as in *Scott* v. *Surman* (Willes, 400), or into other merchandise, as in *Whitecomb* v. *Jacob* (1 Salk. 161) ; for the product or substitute for the original thing still follows the nature of the thing itself, as long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fail." But he dissents from the application of the rule made by Lord Ellenborough, when the latter added, " which is the case when the subject is turned into money and confounded in a general mass of the same description ; " for equity will follow the money, even if put into a bag or an undistinguishable mass, by taking out the same quantity. And the doctrine that money has no ear-mark must be taken as subject to the application of this rule. The Court of Appeals had previously applied the very rule as here stated in the case of *Birt* v. *Burt*, reported in a note to *Ex parte Dale & Co.*, 11 Ch. D. 773.

The principle is illustrated by many cases in this country. In *Farmers' & Mechanics' National Bank* v. *King* (57 Pa. St. 202), a collector of rents deposited moneys of his principal in a bank in his own name; it was attached by a creditor of the depositor, and immediately afterwards notice of ownership was given by the principal. It was held that the attaching creditor stood in the position of the depositor, and could recover only what the depositor could. The law of the case was stated by Judge Strong in the following language : " It is undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner so long as it can be identified. And it does not matter in whose name the legal right stands. If money has been converted by a trustee or agent into a chose in action, the legal right to it may have been changed, but equity regards the beneficial ownership. It is conceded, for the cases abundantly show it, that when the bank received the deposits it thereby became a debtor to the depositor. The debt might have been paid in answer to his checks, and thus the liability extinguished, in the absence of interference

by his principals, to whom the money belonged. But surely it cannot be maintained that when the principals asserted their right to the money before its repayment, and gave notice to the bank of their ownership, and of their unwillingness that the money should be paid to the agent, his right to reclaim it had not ceased. A bank can be in no better situation than any other debtor."

The same doctrine was strongly maintained by the New York Court of Appeals in the case of *Van Alen* v. *American National Bank*, 52 N. Y. 1. In that case it was decided that when an agent deposits in a bank to his own account the proceeds of property sold by him for his principal, under instructions thus to keep it, a trust is impressed upon the deposit in favor of the principal, and his right thereto is not affected by the fact that the agent at the same time deposits other moneys belonging to himself ; nor is it affected by the fact that the agent, instead of depositing the identical moneys received by him on account of his principal, substitutes other moneys therefor. In the course of the opinion, Church, C. J., said : " It was suggested on the argument that notice to the bank by the depositor was necessary to protect the rights of the plaintiff ; but this is not so. The title of the plaintiff does not depend upon whether the bank knew he had a title or not. That rested upon other facts. A notice to the bank might have prevented any transfer or the creation of a lien by the depositor, or prevented the bank from taking or acquiring such lien in good faith, but could not otherwise be necessary or important."

This doctrine of equity is modern only in the sense of its being a consistent and logical extension of a principle originating in the very idea of trusts, for they can only be preserved by a strict enforcement of the rule that forbids one holding a trust relation from making private use of trust property. It has been repeatedly recognized and enforced in this court. *Oliver* v. *Piatt*, 3 How. 333 ; *May* v. *LeClaire*, 11 Wall. 217 ; *Duncan* v. *Jaudon*, 15 id. 165 ; *Bayne* v. *United States*, 93 U. S. 642 ; *United States* v. *State Bank*, 96 id. 30.

The relation of Dillon to the insurance company was one of confidence and trust. He was its agent for the collection of premiums, which belonged to it no less when in his hands than

before their receipt by him. He was to account for them, under its directions, and in his entire dealing with them was bound to obey its orders. He was not merely its debtor for the amount in his hands. He held the fund for the use and as the property of the company. *Foley* v. *Hill*, 2 H. of L. Cas. 28. In a direct suit between them, *Dillon* v. *Connecticut Mutual Life Insurance Co.* (44 Md. 386), it was so expressly ruled, the Maryland Court of Appeals saying : "Dillon not only held the fiduciary relation to the company of its agent, but was acting in respect to this and all the money he collected while such agent, under specific directions as to what he should do with it, directions which the company had the right, for its own protection and that of its policy-holders, to have specifically performed. . . . He must, we think, be regarded and treated as a trustee, and the fund thus in his hands must be considered as so far impressed with a trust as to give a court of equity jurisdiction of the case on that ground, if on no other."

Evidently the bank has no better right than Dillon, unless it can obtain it through its banker's lien. Ordinarily that attaches in favor of the bank upon the securities and moneys of the customer deposited in the usual course of business, for advances which are supposed to be made upon their credit. It attaches to such securities and funds, not only against the depositor, but against the unknown equities of all others in interest, unless modified or waived by some agreement, express or implied, or by conduct inconsistent with its assertion. But it cannot be permitted to prevail against the equity of the beneficial owner, of which the bank has notice, either actual or constructive.

In the present case, in addition to the circumstance that the account was opened and kept by Dillon in his name as general agent, and all the presumptions properly arising upon it, we have found that other facts proven on the hearing justify and require the conclusion that the bank had full knowledge of the sources of the deposits made by Dillon in this account, and of his duty to remit and account for them as agent of the insurance company. It is, consequently, chargeable with notice of the equities of the appellee.

In our opinion the equity of the case, upon the merits, was

manifestly with the appellee. But the appellant has assigned other errors upon the decree which remain to be considered.

It is claimed that the suit while in the Circuit Court abated by reason of the dissolution of the defendant below as a corporate body.

The Central National Bank was organized Jan. 16, 1871, under the act of June 3, 1864, c. 106 (13 Stat. 99), and the amendments thereto. Its articles of association provided that "this association shall continue for the period of twenty years from the date of the organization certificate, unless sooner dissolved by the act of its stockholders owning at least two-thirds of its stock, who may dissolve and close up the association in such manner as they may deem to be for the interest of the stockholders and creditors of the association, but subject to the restrictions, requirements, and provisions of the act."

On July 15, 1874, three days before the complainant's bill was filed, at a meeting of the stockholders of the bank held pursuant to law, "it was voted by the stockholders of said association owning more than two-thirds of its stock, that said association go into liquidation and be closed."

It is certified by the Comptroller of the Currency "that the Central National Bank of Baltimore went into voluntary liquidation on July 15, 1874, under sections 5220 and 5221 of the Revised Statutes of the United States, and on Jan. 8, 1875, deposited legal-tender notes with the treasurer of the United States for the full amount of its outstanding circulation, as provided in section 5222 of the Revised Statutes, whereupon the bonds deposited by the association for the purpose of securing its circulating notes were delivered to the bank, thus finally closing its connection with this department."

It further appears that the bank ceased to do any new banking business after resolving to go into liquidation; paid its depositors and other creditors, so far as their claims were admitted; reduced its assets to cash, and distributed the money among the shareholders, paying them back their capital in full with an accumulation of two per cent premium. The bank's lease of its banking-house expired March 1, 1875, when its doors were closed, its clerks discharged, and afterwards its furniture removed and disposed of and its signs taken down.

On Feb. 1, 1875, a special authority was issued by the board of directors, authorizing the president and acting cashier to act for and do all legal acts that might become necessary in the liquidation of the business of the bank.

It is claimed that these facts show a dissolution of the corporation.

It is provided by sect. 5136 of the Revised Statutes that every national bank, duly incorporated, shall " have succession for the period of twenty years from its organization, unless it is sooner dissolved according to the provisions of its articles of association, or by the act of its shareholders owning two-thirds of its stock, or unless its franchise becomes forfeited by some violation of law."

By sect. 5220 it is also provided that " any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock."

Sect. 5221 requires that whenever a vote is taken to go into liquidation, notice of the fact shall be given to the Comptroller of the Currency, and publication made in newspapers, that the association is closing up its affairs, and notifying its creditors to present their claims for payment.

Six months thereafter is given by sect. 5222, in which the association is required to deposit with the treasurer of the United States lawful money of the United States sufficient to redeem all its outstanding circulation.

Sect. 5224 further provides that when that deposit has been made, the bonds deposited to secure payment of its notes shall be reassigned to it. " And thereafter the association and its shareholders shall stand discharged from all liabilities upon its circulating notes, and their notes shall be redeemed at the treasury of the United States."

In connection with the provision of the articles of association of the Central National Bank, already noticed, these are all the provisions of law that are supposed to affect the question.

It is to be observed that the sections under which the proceedings took place which, it is claimed, put an end to the corporate existence of the bank, do not refer, in terms, to a dissolution of the corporation, and there is nothing in the language which suggests it, in the technical sense in which it is

used here as a defence. The association goes into liquidation and is closed. It is required to give notice that it is closing up its affairs, and in order to do so completely and effectually, to notify its creditors to present their claims for payment. And the redemption of its bonds given to secure the payment of its circulating notes, by the required deposit of money in the treasury, is limited in its effect to a discharge of the association and its shareholders from all liability upon its circulating notes. The very purpose of the liquidation provided for is to pay the debts of the corporation, that the remainder of the assets, being reduced to money, may be distributed among the stockholders. That distribution cannot take place, with any show of justice, and according to the intent of the law, until all liabilities to creditors have been honestly met and paid. If there are claims made which the directors of the association are not willing to acknowledge as just debts, there is nothing in the statute which is inconsistent with the right of the claimant to obtain a judicial determination of the controversy by process against the association, nor with that of the association to collect by suit debts due to it. It is clearly, we think, the intention of the law that it should continue to exist, as a person in law, capable of suing and being sued, until its affairs and business are completely settled. The proceeding prescribed by the law seems to resemble, not the technical dissolution of a corporation, without any saving as to the common-law consequences, but rather that of the dissolution of a copartnership, which, nevertheless, continues to subsist for the purpose of liquidation and winding up its business.

In the case of *Bank of Bethel* v. *Pahquioque Bank* (14 Wall. 383), the same question was made in reference to a national bank which, having become insolvent, by a refusal to pay its circulating notes, was put into liquidation by the Comptroller of the Currency, by the appointment of a receiver under other provisions of the bank act. It was there claimed, for the purpose of defeating a suit brought against the bank by name, that the appointment of the receiver, who had refused to admit and pay the plaintiff's claim, was a dissolution of the corporation. Mr. Justice Clifford, delivering the opinion of the court, recited the provisions of the law upon the subject, and said

" None of these proceedings, however, support the theory that the association ceased to exist when the receiver was appointed, nor at any time before the assets of the association are fully administered, and the balance, if any, is paid to the owners of the stock or their legal representatives." p. 398.

" Much aid cannot be derived from authorities in the examination of this proposition, as the question turns chiefly, if not entirely, upon the construction of the act of Congress; and suffice it to say that we are all of the opinion that the act contains nothing in its subsequent provisions inconsistent with the theory of the plaintiffs, that the association may sue and be sued, complain and defend, in all cases where it may be necessary that the corporate name of the association shall be used for that purpose in closing its business and winding up its affairs, under the provisions of the act which authorized its formation." p. 400.

In that case it was argued, as in this, that as the only constitutional warrant for the existence of a national bank was its connection with the government as a fiscal agent, the severance of that connection *ipso facto* deprived it of vitality. The same argument would render it incapable of returning to its stockholders their capital and accumulated profits. If it was a reasonable incident to its living that it should contract debts, it is equally a reasonable incident to its dissolution that it should pay them. We see no constitutional impediment that prevents it.

The same conclusion was reached by the Court of Appeals of Maryland in the case of *Ordway* v. *Central National Bank*, 47 Md. 217.

The second section of the act of June 30, 1876, c. 156, authorizing the appointment of receivers of national banks, and for other purposes (19 Stat. 63), provides that when any national banking association shall have gone into liquidation under the provisions of sect. 5220 of the Revised Statutes, the individual liability of the stockholders, provided for by sect. 5151 of said statutes, may be enforced by any creditor of such association by bill in equity, in the nature of a creditor's bill, brought by such creditor on behalf of himself and of all other creditors of the association against the shareholders thereof, in

any court of the United States having original jurisdiction in equity for the district in which such association may have been located or established.

It appears that the appellee filed, Jan. 8, 1878, in the Circuit Court of the United States for the District of Maryland, its bill of complaint against the appellant and the persons who were shareholders in the bank at the time it resolved to go into liquidation, under the provisions of that section.

It is urged that the act of 1876 is itself evidence that the bank was dissolved as a corporation by the proceedings in liquidation, and that the pendency of the bill authorized by it was a bar to any further proceeding in the present suit.

We see nothing in the act inconsistent with the continued existence of the bank as a corporation for the purposes of liquidation. Indeed, it seems to confirm the idea that for the purpose of being sued, in order judicially to determine the question of disputed liability, it continues to exist, and the remedy against the shareholders is added as a means of execution, in case the corporate assets have in the mean time been otherwise applied or shown to have been insufficient. It is a cumulative remedy and against other persons, and cannot be considered as an objection to the rendition of the present decree.

It is also assigned for error that the appellee failed to set down for argument or traverse the pleas of the defendant, as required by the thirty-eighth equity rule; but the pleas in this case were irregularly filed and defective, under the thirty-first rule, for lack of the affidavit of the defendant that they were not interposed for delay, and of the certificate of counsel that they were, in his opinion, well founded in point of law, and may well have been disregarded on that account. Besides, the second and third pleas were such only in form, as they merely alleged matters of law and not of fact.

"The office of a plea," said Lord Eldon, in *Rowe* v. *Teed* (15 Ves. Jr. 372), "generally, is not to deny the equity, but to bring forward a fact which, if true, displaces it." The first plea is open to the same objection; for, although it appears to negative the averment of a matter of fact essential to the complainant's case, — that he was a creditor of the defendant, — yet really it merely denies the conclusion of law, to be drawn from

the whole of the case as stated in the bill. Every matter, therefore, covered by the pleas was necessarily embraced in the hearing upon the bill, answer, and proofs. There was no issue tendered on matter of fact that was left undecided, and no matter of law affecting the merits that was not adjudged.

It is also assigned for error that the complainant failed to file a replication to the answer. Leave to do so was granted by the court, on the complainant's motion; and although the transcript does not show that it was done, the parties went to the hearing as if it had been done, submitting the case upon the proofs which had been taken, as though a formal issue had been perfected.

The same objection was made in the cases of *Clements* v. *Moore* (6 Wall. 299) and *Laber* v. *Cooper* (7 id. 565), under circumstances not distinguishable from the present, and for the reasons there stated it is overruled.

The absence of an answer by Dillon, and the want of an issue upon it, is also assigned for error. The transcript shows that an answer had been filed by Dillon, but had been lost or mislaid. This fact having been called to the attention of the court below, before the hearing, the circuit judge announced that he would not proceed with the hearing without the answer, if the respondent's solicitor, then present, objected to the hearing for that reason. No objection was made, and the hearing properly proceeded. For aught that appears, Dillon's answer may have been a confession of the truth of the allegations of the bill.

We find no error in the record.

*Decree affirmed.*