## GILLESPIE *et al. v.* UNION STOCK-YARDS NAT. BANK *et al.*

*(Circuit Court, N. D. Illinois.   July, 1888.)*

BANKING—APPLICATION OF FUNDS.

A member of defendant firm selected cattle, which plaintiffs paid for and shipped to Chicago, where they were sold by defendants.   Two of the plaintiffs, corroborated by a third witness, testified that they shipped the cattle as their own, while the defendant who selected them testified that they were not to be shipped as plaintiffs' property, but they were to receive a specific sum per car for their advancements and trouble.   On sale of the cattle, tickets showing weight and price were given defendant bank for collection.   The bank knew that defendant firm received and sold cattle for shippers, and, on the day a shipment from plaintiffs arrived, received a draft drawn by plaintiffs on defendant firm, but failed for over 24 hours to give notice of its dishonor, and appropriated the proceeds of this and two subsequent shipments to the payment of a note and the overdraft of defendant firm.   *Held,* that the ownership or control of the cattle was in plaintiffs, and the bank had sufficient notice to entitle them to the proceeds, as against the appropriation by the bank to the account of defendant firm.

In Equity.

*Bisbee, Ahrens & Decker,* for complainants.

*Peckham & Brown,* for defendants.

GRESHAM, J., (*orally.*)   A. J. Gillespie, John F. Gillespie, and T. E. Gillespie, live-stock commission merchants at Kansas City, brought this suit in equity to recover the net proceeds of three consignments of cattle shipped by them to F. J. Rappal, Sons & Co., at Chicago.   Rappal, Sr., selected the cattle at Kansas City, had them weighed, and delivered the weight tickets to Gillespie & Co., who paid for and shipped the cattle to Chicago.   Two of the Gillespies swore the contract with the senior Rappal was that Gillespie & Co. should ship the cattle as their own, and have control of them until sold at Chicago and paid for.   In this they were fully corroborated by the witness James.   The senior Rappal, on the other hand, swore that that was not the arrangement; that the agreement was that the Gillespies should furnish the money for the purchase of the cattle, which they did, and ship them as the property of Bowen & Co.; and that the Gillespies should receive a specific amount per car for their advancements and trouble.   The two sons testified that the contract was as their father, the senior Rappal, testified; but they admitted that all they knew of the agreement was what their father had told them. On this point there is a square conflict between the two Gillespies and James on one side, and the senior Rappal on the other, and his state-

ment is improbable. It is difficult to believe that Gillespie & Co. furnished such large sums of money without security, which they did, if they had not the right to control the cattle until sold. It is not claimed that the Gillespies had any security whatever for these large advancements, unless the cattle were to be theirs, or they had authority to control them until disposed of. I hold that the cattle belonged to the Gillespies, or that they were entitled to control them so far as necessary to protect themselves for advancements made on the purchases.

The first shipment arrived at Chicago on Friday morning. Gillespie & Co. drew against this shipment, and the draft was discounted by the Kansas City Bank. The Gillespies also drew against the two subsequent shipments, and these drafts were also discounted by the Kansas City Bank, and that bank sent all the drafts to the Union Stock-Yards National Bank for collection. The draft drawn against the first shipment was received by the latter bank before, or certainly as soon as, the cattle were received. This draft was presented to the Rappals for payment. Payment was refused, and the draft was protested. This was on Friday, and no notice was given of it for at least 24 hours, perhaps more. The cattle were consigned to and received by the Stock-Yards Company. By the weight-bills, the consignee was directed to deliver the cattle to the Rappals, who received them and sold them at the stock-yards. The cattle were weighed, and the Rappals furnished with tickets showing the weight and price, which they delivered to the Stock-Yards Bank for collection. The bank made the collections, and placed the amounts to the credit of Rappal, Sons & Co., who at this time were indebted to the bank on a past-due note and for overdrafts; and the bank claimed against Gillespie & Co. that it had appropriated this money as a credit on the indebtedness of Rappal, Sons & Co.

A bank has a lien on the securities or funds of a depositor to the extent of any amount owing from him to the bank for overdrafts, past-due notes, or in other ways, but this is true only of funds which belong to the depositor or debtor. The Stock-Yards Bank was familiar with the mode of doing business at the stock-yards. It knew that Rappal, Sons & Co. were engaged in receiving cattle from shippers, and selling them at Chicago. When the bank received the ticket for the first shipment, (and the other shipments were disposed of in the same way,) showing the weight and price, it knew, of course, that the money called for by that ticket represented cattle that some one had shipped to Rappal, Sons & Co. for sale. If the bank did not know this, the facts fairly put it upon inquiry, and it could and should have ascertained whether Rappal, Sons & Co. owned the cattle, and the proceeds of their sale, before appropriating them. Furthermore, the failure or refusal of Rappal, Sons & Co. to pay the first draft—the bank knowing the business in which they were engaged—was notice to the bank that this firm was probably behind with some shipper; if, indeed, it did not know the shipper was Gillespie & Co. Rappal, Sons & Co. being indebted to the bank for overdrafts and on past-due notes at the time the first draft was presented and protested for non-payment, it is safe to assume that the officers of the·

bank then did what business men would be expected to do under such circumstances. How natural that they should then say to Rappal, Sons & Co.: "We want to know what this means. You are indebted to us; explain this thing. Who shipped the cattle against which this draft was drawn? Under what circumstances were they shipped to you? Is this your money, or is it the money of some one else?" But, as already stated, it is not material whether, at the time the bank claims to have appropriated the money, it actually knew the relation that existed between Rappal, Sons & Co. and Gillespie & Co.; for it knew too much to be permitted to make the appropriation as against Gillespie & Co., who paid for the cattle and shipped them under the agreement already stated. In view of Rappal, Sons & Co.'s indebtedness to the Union Stock-Yards Bank, it is significant, to say the least, that it delayed for 24 hours or more to notify the bank at Kansas City, which had discounted the first draft, and sent it to the bank here for collection, that the draft had been protested for non-payment. The evidence shows that the Union Stock-Yards Bank had never before failed to send to the Kansas City Bank prompt notice by telegraph of failure or refusal to pay any draft which the latter had sent to the former for collection. This was the first failure of the Stock-Yards Bank to send immediate notice by telegraph to the Kansas City Bank, in accordance with the latter's instructions. The necessity for such notice was obvious. A draft was usually drawn against each shipment of cattle at Kansas City, and discounted by the Kansas City Bank, and sent to the Union Stock-Yards Bank for collection. The Kansas City Bank, and the parties for whom it had discounted drafts, required prompt notice by telegraph of non-payment, that it might be able to stop the cattle, against which the drafts had been drawn, by legal proceedings, if necessary, and thus prevent loss. All cattle arriving at Chicago are shipped to the Stock-Yards Company, and it may be that, after the first draft had been protested, an order from Gillespie & Co. to the Stock-Yards Company, not to deliver the cattle to Rappal, Sons & Co., would have been sufficient for the protection of Gillespie & Co., without resorting to legal proceedings. The president and cashier of the bank testified that it was not by their direction that the Kansas City Bank was not notified of the protest of the first draft; that prompt notice should have been sent by telegraph, and that the clerk who should have prepared and sent such notices had neglected his duty. It is immaterial that the president and cashier did not know of the failure to send timely notice to the Kansas City Bank, as the neglect of the clerk was the neglect of the bank. I do not mean to say, however, that the complainants could not recover if proper notice had been given of the protest of the first draft.

The remaining question is,—Can this suit be maintained on the equity side of the court? I have had some misgivings on that point, but Judge BLODGETT overruled a demurrer to the bill, and *National Bank* v. *Insurance Co.*, 104 U. S. 54, appears to be authority for that ruling. The decree will be for the amount of the net proceeds of the three shipments, with interest from the date of demand.