ARTHUR C. SHERMAN

*v.*

THE SHERMAN & LYON COMPANY, an insolvent corporation.

[Submitted October 17th, 1902.   Decided November.6th, 1902.
Filed January 26th, 1903.]

A typewriter company appointed "dealers" for the sale of its machines
in South Africa, they to purchase and pay for the machines consigned
to them, with the exclusive right of sale. A third party had been ap-
pointed temporarily, the appointment terminating May 1st, 1894, and the
defendant corporation, which had an agent in South Africa, had, late in
June, been appointed in his stead, but the temporary dealer was to have
the right to continue, if he desired, to November 1st. He accordingly in
July sent in an order for machines, which were sent to him. The type-
writer company at the same time wrote defendant's agent that it would
draw on the temporary dealer in the usual way, and send the drafts to
him to be collected, "by presenting the drafts to him either personally or
through the bank which usually receives them," &c. A few days later
they sent the draft to defendant, with the request that it be transmitted
to the agent for collection, &c. The agent made the collection and de-
posited the proceeds to the credit of the defendant, which afterwards
became insolvent.—*Held,* that the agent was acting in the matter for the
typewriter company and should have remitted direct to it, and it was
accordingly entitled to have its claim for the amount of the draft preferred.

On appeal from the refusal of the receiver to give preference
to a claim of Wyckoff, Seamans & Benedict.

*Mr. Edward Q. Keasbey,* for the appellants.

*Mr. Robert H. McCarter,* receiver, *pro se.*

PITNEY, V. C.

The appellants, Wyckoff, Seamans & Benedict, of New York
City, manufacturers of the Remington Standard Typewriter,
presented a claim to the receiver to be preferred creditors of the
insolvent corporation to the extent of $509.79, being the amount

of a draft drawn on the 30th of July, 1894, by the appellants on one S. Edmonds Smith, a merchant at Cape Town, South Africa, and collected there by one Wilson D. Lyon, who forwarded the proceeds to the insolvent corporation in New York after the appointment of the receiver herein, who in turn received the same.

The amount of the draft was the balance due from Smith for an invoice of fifteen typewriters shipped by the appellants to him. Lyon was the general agent of the insolvent corporation in South Africa.

The equitable basis of the claim is that the money was collected by Lyon not as general agent for the corporation, but as special agent of the appellants, and was, without appellants' authority, mingled by him with the funds of his principal, the insolvent corporation, and in that way came to the hands of the receiver; and that the circumstances placed Mr. Lyon in the situation of a trustee for the appellants, and vested in them an equitable right to have the full amount paid to them.

A careful examination of the authorities leads me to the conclusion that the question is one of fact. Was Mr. Lyon justified, under the instructions sent to him by the appellants, in mingling that money with the money of the insolvent corporation? Or, to state it otherwise, ought the appellants to have expected, when they sent the draft on Smith to Mr. Lyon, that the proceeds of it would be mingled with the funds of the insolvent corporation; or did they have a right to expect that Mr. Lyon would remit the proceeds to them directly?

The facts more in detail are these: The appellants, previous to the date in question, had what they called "dealers" in South Africa for the sale of their machines. They appointed no agents, and consigned no machines to be sold on commission, but appointed dealers who were to purchase and pay for the machines, with the exclusive right of sale in South Africa.

The insolvent corporation was endeavoring to establish a general merchandise business in South Africa, and, for that purpose, it had an agent, Mr. Lyon, who, prior to 1894, had traveled extensively in that country and familiarized himself with business affairs there. In the summer of 1894 he was in the city of New

York, and, as the agent for the insolvent corporation, had an interview with the appellants, the result being that the appellants appointed the insolvent corporation their dealer in South Africa.

This appointment was made by two long letters dated on the 26th and 28th of June, 1894, not necessary to be here transcribed.

It appears that at or prior to that time one Aitken had been their dealer at Cape Town, and had given up business on account of ill health, and had been succeeded temporarily by Mr. Smith, whose appointment as dealer had expired on May 1st, 1894; so that the appointment of the insolvent corporation took effect almost immediately, although in the letters to which I have referred the appellants expressed their willingness that Mr. Smith should continue if he desired until November 1st then next.

Mr. Lyon proceeded to South Africa during the month of July, 1894, and some time shortly before the 26th of July, 1894, the appellants received from Mr. Smith two orders for an aggregate of fifteen machines, accompanied by a draft for about half of the cost of the machines, to wit, $495. The appellants immediately prepared to ship the machines to Mr. Smith, and at the same time wrote to Mr. Lyon, at Cape Town, a letter, as follows:

"NEW YORK, July 26th, 1894.

"*Mr. W. D. Lyon, Cape Town, South Africa:*

"DEAR SIR—Since writing you on the 19th inst. we are in receipt of two orders for machines from Mr. S. Edmonds Smith, both by cable, the first for five No. 5 machines and the second for ten No. 5 machines, the latter being stated as urgent. We are somewhat surprised at this, as we hardly expected to receive further orders from Mr. Smith, in view of his recent communication resigning the dealership and his expressed desire to sell out the stock that he already had on hand. Inasmuch as these orders must have been dispatched from Cape Town before any news of our changed arrangements could have reached him, we presume that he has found some opportunity of making sales of a number of machines, possibly something which he has been working up for some time. We are glad to have the orders, and of course desire to fill them; at the same time we feel very strongly the necessity of protecting your possible action relative to the appointment of a dealer for Cape Town. We have, therefore, determined, after consultation with your Mr. A. G. Sherman, to ship the machines by steamer 'Olive Branch,' now loading, and expecting to sail about the end of this month. As Mr. Smith complied with the terms of our agreement by cabling remittance for about half of the value, we will

Sherman v. Sherman & Lyon Co.

consign the goods to our own order, and draw upon him in the usual way. We propose to send the documents and draft to you, and will ask you to investigate the disposition that Mr. Smith means to make of this lot of machines. We, of course, would desire to protect him in every way, and enable him to fill his orders received from customers, except only if you find he has sold any lot of machines to any party with the idea of stocking up some one to continue the business as dealer. We would not, of course, desire to embarrass your action in the slightest by permitting the old dealer to provide some outside party with stock. We have no reason to suppose that anything of the sort is contemplated, but wish to take precautions to avoid any possible embarrassment in the arrangements which you may seek to make. Even if Mr. Smith has made a sale to some outside party of a number of machines which would comprise a stock, it may be possible for you to adjust matters so that the delivery can still be made and Mr. Smith obtain his profit, but this will be a matter for you to decide. If you find the machines are sold to individual users in the regular way of business, we would request that you let the business go through Mr. Smith in the usual way, by presenting the drafts to him, either personally or through the bank which usually receives them—the Standard Bank, we believe.

"In the event of your finding that any disposition likely to embarrass our future business in South Africa is to be made of these machines, we would ask you to notify Mr. Smith to this effect, and treat them as a consignment to be sold to best advantage, at not less than the list prices which may be established for future business in South Africa. In the event of your having to take charge of them in this way, we trust you will make some disposition of them as speedily as possible, using them to stock up the sub-dealers that you may appoint, if possible, or selling them out to users, as we do not care to have goods upon consignment. It is quite foreign to our method of doing business in foreign countries. Of course if you take charge of the goods thus, it will be necessary for you to advise us promptly, so that we can immediately return to Mr. Smith the amount of his remittance to us. We hope, however, that no action of this sort will be necessary. We will probably cable you something about this, if we can make up a message that will be intelligible without too great an expense, as we would like you to be informed at once that the machines are on the way, so that you may make arrangements for Cape Town with full information as to the situation before you.

"Yours truly,

"WYCKOFF, SEAMANS & BENEDICT."

On July 30th, 1894, they wrote the insolvent corporation as follows:

"NEW YORK, July 30th, 1894.

"The Sherman & Lyon Co., New York City:

"GENTLEMEN—Referring to copy of our letter of the 26th inst. to your Mr. W. D. Lyon, at Cape Town, we now beg to hand you herewith bills of lading for fifteen cases of typewriters shipped per steamer 'Olive

Branch' to Cape Town, consigned to our own order, together with certificate of insurance No. 108,393, in the Atlantic Mutual Insurance Co. for $1,100, together with our draft (F No. 1) at thirty days' sight upon Mr. S. Edmonds Smith, Cape Town, for the sum of $509.79. This amount is the balance of our account with him, after deducting a draft made upon him of which we have not yet received the proceeds. We also enclose invoices to Mr. Smith for these goods. Will you kindly transmit these documents to your Mr. W. D. Lyon, at Cape Town, to be dealt with according to the instructions contained in our letter of the 26th inst. to him? Doubtless this business is perfectly regular, but, as the writer mentioned to your Mr. Sherman the other day, we prefer to take this course in order to give your Mr. Lyon the power to prevent these machines falling into the hands of any one who would compete with the dealer he may appoint in Cape Town.

"We enclose herewith copy addressed to Mr. Lyon under this date.

"Yours truly,

"WYCKOFF, SEAMANS & BENEDICT."

And on the same day they wrote to Mr. Lyon a supplement to the letter of July 26th, as follows:

"NEW YORK, July 30th, 1894.

"*Mr. W. D. Lyon, Cape Town, South Africa:*

"DEAR SIR—Referring to our respects of the 26th inst., we note in looking over the copy that we worded our instructions regarding dealing with the machines shipped by the 'Olive Branch' in such a fashion that you might perhaps misunderstand our intention. In speaking of selling them at not less than the list price which might be established for future business in South Africa, we had in mind the sale of the machines to actual users. We will, of course, have no objection to your selling this stock to supply your sub-dealers with, at such discounts as you may agree upon for business with them, in case you find it impracticable to dispose of these machines through Mr. Smith. We think it best to make this explanation.

"Yours truly,

"WYCKOFF, SEAMANS & BENEDICT."

The insolvent corporation forwarded the bills of lading, invoice and draft, usually called the "documents," to Mr. Lyon, who received them, and on the arrival of the goods about the 1st of September he called on Mr. Smith and arranged with him that he, Smith, should retain twelve of the machines which he had already sold, and that he, Lyon, should take the remaining three on account of the insolvent corporation. Mr. Smith, in pursuance of this arrangement, paid the freight, &c., on the fifteen machines, charged to the appellants the share thereof due to the three machines so taken and paid Mr. Lyon the balance—

£63.15.0, equal to $310.24. That sum represented the value of the twelve machines, less the freight and other charges on three machines. Just how much the latter was the proofs do not show.

That check was deposited in a bank by Mr. Lyon on September 6th to the credit of the insolvent corporation, and laid there for about a month. Mr. Lyon made sales of other property and collected the proceeds thereof, and deposited the same in the same bank to the credit of the insolvent corporation; and then when £200 and more had accumulated, he, on October 6th, cabled the whole to the insolvent corporation in New York City. The reason why he did not sooner cable the amount was that the bankers would not transfer by cable less than £200.

The £63.15.0 were collected and deposited before the insolvent corporation failed. The transfer by cable occurred after it failed, but before Mr. Lyon had heard of it. The balance of the money to make up the amount he cabled was deposited on September 17th.

The case is free from any difficulty arising out of a series of deposits and drafts. The cable credit undoubtedly comprises the Smith money.

It will be seen from this statement that the payment of £63.15.0 for the twelve machines stands on a different footing from that of the proceeds of the sale of the three machines deposited later. I think, with regard to the larger sum, that it was clearly collected by Mr. Lyon as the agent of the appellants.

With regard to the proceeds of the sale of the three machines, that sale was made by Mr. Lyon as agent of the insolvent corporation, in strict pursuance of the original appointment of it as "dealer" for the appellants, and had no earmark of special agency or trust; and the appellant's case as to that fails. They must take their stand with the general creditors as to that part of their claim.

The claim to the extent of £63.15.0, together with the as yet unascertained amount of freight and charges paid by Smith on the three machines taken by Lyon, raises a very nice question. The rule in equity governing it seems to be pretty well settled by a long line of cases culminating in England in the case of

*Knatchbull* v. *Hallett, 13 Ch. Div. 696 (1880)*. A large number of cases, including *Ex parte Dale, 11 Ch. Div. 772,* and *Pennell* v. *Deffell, 4 De G., M. & G. 372,* were there cited and exhaustively discussed. Those cases hold that there is no difference between the case of a trustee of an express trust and that of a mere special agent for the collection of moneys; and the latter case determines, contrary to many of the previous cases, that if, in the case of a bank, the funds in the hands of the banker are sufficient to cover the amount of the trust fund mingled therein, it matters not that since the deposit was made there have been additions and subtractions made therefrom in the ordinary course of business. And this is the rule in this country. *Frelinghuysen* v. *Nugent, 36 Fed. Rep. 229; Perth Amboy Gas Co.* v. *Middlesex County Bank, 15 Dick. Ch. Rep. 84,* and cases cited; *National Bank* v. *Insurance Co., 104 U. S. 54,* where all the cases to that date are discussed.

But in all these cases there was a breach of duty on the part of the trustee—that is, he innocently, it may be, mingled the funds of the principal with his own in a manner not authorized either by the directions of the principal or by the ordinary course of business. The principle seems to be that no man can be made the general creditor of another without his consent, express or implied. *Libby* v. *Hopkins, 104 U. S. 308.*

I can find no authority for the proposition, and none has been pointed out by the industry of counsel, that where, for instance, a party is engaged in the business of collecting money, and in the regular course of that business deposits that money in bank, not to the individual credit of each client, but to his own credit generally, and that course of business is understood and approved by his principal, any right of preference arises out of the transaction. His conduct in making the deposit which results in mingling trust moneys with his own was done in the ordinary regular course of business, and by the implied authority of his principal. In other words, his principal had no right to expect him to do otherwise.

Turning now to the facts in this case, we find by the original correspondence that the insolvent corporation was in no sense to act as the agent of the appellants or to do anything more than

to have the exclusive right to buy goods of them for resale in South Africa, and upon the terms of paying cash therefor.

Just at the time the insolvent corporation was about to become the exclusive purchaser or dealer of the appellants' goods this sale to Smith intervened and formed an exceptional state of affairs. The appellants then, acting entirely in the interests of the insolvent corporation, gave its agent in South Africa a special authority to deal in a particular way with the affair, and the net question is, as before stated, did they expect, or ought they to have expected, Mr. Lyon, when he collected the draft, to mingle the moneys with those of the insolvent corporation to be transmitted to them; or did they expect, or ought they to have expected, him to transmit directly to them? And right here we have the circumstance that although they, in the first place, on July 26th, wrote directly to Lyon, they, four days later, actually delivered the documents, including the draft on Smith, to the insolvent corporation to be forwarded to Lyon. Looking carefully, however, to the letter accompanying that delivery, I cannot see that it denudes the transaction of its special character before mentioned.

The difficulty in the case is that neither of the letters gives any special direction as to the mode in which the money should be transmitted, except that the appellants suggest in the letter of July 26th, as follows:

"If you find the machines are sold to individual users in the regular way of business, we would suggest that you let the business go through Mr. Smith in the usual way, by presenting the drafts to him, either personally *or through the bank which usually receives them—the Standard Bank, we believe.*"

Now, the mention of letting them go through a bank which in the usual course of business would transmit directly to the appellants, the shippers, has some significance.

I conclude, upon the whole case, and considering that the presumption is that when a special agent, for a particular purpose, collects a sum of money he will transmit it directly to his principal in the usual way practiced in foreign countries, that the weight of the evidence is that the appellants had reason to ex-

pect a direct remittance to them of the proceeds of the draft. If this be so, then Mr. Lyon was not justified in putting the £63.15.0 to the credit of the insolvent company, but should have purchased a bill of exchange with it in favor of the appellants.

I therefore conclude that the appellants' claim must be allowed to the extent of the £63.15.0 ($310.24) plus the amount paid for charges against the three machines which were taken by the insolvent corporation's agent in the regular course of business, less the amount of the cost of exchange on New York.