GUSTAVUS T. BEAUREGARD, HEIR AND EXECUTOR OF MADAME EMILIE T. POULTNEY, COMPLAINANT AND APPELLANT, *v.* THE CITY OF NEW ORLEANS, WILLIAM H. LAYTON, AND OTHERS.

The habit of this court has been to defer to the decisions of the judicial tribunals of the States, upon questions arising out of the common law of the State, especially when applied to the title of lands.

Therefore, where the supreme court of Louisiana, has decided questions relating to the jurisdiction of the district court of the first judicial district of the State, over the succession of a debtor who was enjoying a respite from the claims of his creditors, for a certain time and died before the time expired; to the mode in which that jurisdiction should be exercised; to the propriety of collaterally attacking a sale made by its authority; to the point whether or not the death of the party transferred the proceedings to the court of probate, and to the mode in which the court of probate should exercise its jurisdiction; this court will adopt these decisions, and especially where many of them concur with the judgments of this court upon the same or similar points.

The Louisiana cases and those of this court, examined.

THIS was an appeal from the circuit court of the United States, for the eastern district of Louisiana.

It was a bill filed by Madame Emilie Poultney, in her life-time, against the city of New Orleans, and about eight hundred and fifty other parties, some of whom included a number of persons, such as the Presbyterian Church, Bank of the United States, &c. &c.

The facts in the case are stated in the opinion of the court.

In November, 1854, the circuit court dismissed the bill, and the complainant appealed to this court.

It was argued by *Mr. Henderson,* for the appellants, and *Mr. Taylor,* for the appellees.

Mr. Justice CAMPBELL delivered the opinion of the court.

The plaintiff's testatrix filed this bill in the circuit court to annul a sale of a portion of the succession of John Poultney, deceased, which had been made under the authority of decrees in the first district court of New Orleans, and of the court of probate of that city, alleging a defect of jurisdiction in the courts, and fraud and irregularity in the proceedings.

42 *

Her title to the succession is as heir at law of the children, and heirs of John Poultney, of whom she was the mother.

In May, 1818, John Poultney, a merchant of New Orleans, purchased of Mad. Rousseau, her plantation lying on the Mississippi River, a short distance above New Orleans, and which is now included within the corporate limits.

The price agreed to was $100,000, one fifth of which was paid at the time, and notes with the indorsement of Harrod and Ogdens, (a firm composed of Charles Harrod, Peter V. Ogden, and George M. Ogden,) payable in five annual instalments, and secured by a mortgage on the property, were given for the remainder. The mortgage contains a stipulation that, in the event the indorsers should pay either of the notes, they should be subrogated to the rights of the vendor and holder of the mortgage for indemnity. In April, 1819, Poultney acknowledged in a petition to the first district court that his affairs were embarrassed, and that he could not meet his engagements; he made a statement of his property and debts, showing a surplus in his favor, and prayed the court to convene his creditors that they might deliberate upon his proposition for a respite of one, two, and three years.

The court made the order, the creditors were convened, the requisite number agreed to the proposition, and an order was accordingly entered the 28th June, 1819, for a respite of one, two, and three years.

Harrod and Ogdens appeared at this meeting—claimed to have paid the first instalment on the purchase of the Rousseau plantation, and assented to the action of the creditors, reserving their mortgage security.

In October, 1819, John Poultney died. His widow, the plaintiff's testatrix, in January thereafter renounced her right as partner in community, and failed to qualify as tutrix of her two children, one aged five, and the other seven years, who were the heirs at law of John Poultney, and did not until eight years after the sales referred to, take any concern about the succession.

The representation made by John Poultney of his affairs at the time his petition for a respite was exhibited, implies a hopeless state of insolvency. His debts are acknowledged to he $235,000, while his property is rated at $266,000—but from its nature affording but little prospect that such an amount could be realized. By the renunciation of his widow of her title as partner in community, and her failure to interpose on behalf of her children, the succession was unrepresented, and was what is termed in the Louisiana code a vacant estate. In February, 1820, a portion of the creditors of Poultney informed the district court that this succession was insolvent—had no representative,

nor claimant—and prayed that measures might be taken for the appointment of a syndic to represent and administer it for the benefit of all concerned. A meeting of the creditors was ordered by the court—and took place—resulting in the appointment of three syndics, (one of whom was Peter V. Ogden,) who were recognized by the court. On the 9th of May, 1820, Harrod and Ogden represented in a petition to the district court the facts of the purchase by Poultney of the Rousseau plantation, their payment of the first instalment of the purchase-money, and their liability to pay another then shortly after to become due; that the succession of Poultney was insolvent, and was in the hands of syndics; and prayed that the plantation might be seized and sold for the satisfaction of their debt and the instalments yet unpaid on the mortgage, and for a citation to the syndics. The usual order of seizure was made by the district judge, and a citation was served on one of the syndics. On the 29th May the syndics agreed in court to the terms of sale and waived the appraisement, and the property was sold on the 13th June by the sheriff on the writ of seizure for the payment of the money then due, the purchaser agreeing to assume the mortgage.

At this sale, George M. Ogden, one of the firm of Harrod and Ogden, was the purchaser, and a deed was subsequently executed to him by the sheriff under the order of the court.

Some time after the close of these transactions, a conviction seems to have been impressed on the minds of Harrod and Ogden that the proceedings in the district court were inoperative; and in 1824, Harrod and the representative of Ogden commenced a suit in the court of probate, having for its object to obtain a satisfaction of the same debt, by the sale of the same property. They sought a seizure and sale of the property, without taking any notice of what had been done in the district court, and prayed a citation to Mad. Poultney as tutrix of her children. No citation appears in the record, but there is evidence of a seizure, judgment, and sale.

The purchasers were Charles Harrod and Francis B. Ogden, who are charged to be the representatives of the first purchaser, G. M. Ogden. These purchasers afterwards, in 1824, represented to the district court that the debt to Mad. Rousseau had been paid, and that the mortgage of George M. Ogden, given, in 1820, to secure the unpaid instalments, was not operative, for that the district court had no jurisdiction to make the sale, and asked that it might be raised from the property. The sheriff admitted all the facts, and the court granted the petition.

These were the last proceedings which had any relation to the case.

The defendants, by plea and answer, affirm that these pro-

ceedings were conformable to law, and vested the purchasers with all the title which John Poultney ever acquired in the property, and that the plaintiff never had any right therein; that they had no participation in, nor knowledge of, any fraud, but that they have translative titles from these purchasers, and rely upon their sufficiency.

In 1832, Mad. Poultney assumed the office of tutrix of her minor children, and commenced, immediately after, suits in the state courts of Louisiana for the recovery of portions of this plantation. Three of these suits were decided in the supreme court in 1835, after elaborate and learned arguments, and a patient investigation by the court. Poultney's Heirs v. Cecil, 8th La. R. 322; v. Ogden, 8 La. 428; v. Barrett, 8 La. 441. These decisions were made upon a state of facts similar to that presented in this record; and the discussion in those cases has diminished the care and responsibility of this court. For it is apparent that the questions presented to us relate exclusively to the local jurisprudence of Louisiana. When the controversy arose all the parties were citizens of that State, while the subject of the suit is the validity of titles passed under decrees of its courts, and in the course of duty, by their executive officers.

The material inquiries are, whether the first district court had a jurisdiction competent to the legal transfer of the succession of a debtor, who was enjoying a respite from the claims of his creditors for an unexpired term, at the time of his death and before any default had arisen in the fulfilment of the conditions of the respite as to payment. 2. Whether this jurisdiction could be exerted without any citation to the natural heirs, or any measures taken to secure their interests in the succession? 3. Were the modes prescribed for the disposal of the estates of insolvent debtors, or of minors, essential constituents of a valid exercise of the jurisdiction, and for the neglect of these may the sale be collaterally attacked? 4. Did the death of Poultney determine the jurisdiction of the district court, and remove to the court of probate the administration and settlement of the succession, and were all the proceedings in the district court *coram non judice?* 5. Was a citation to the heirs neceesary to a valid decree of sale in the court of probate? An important share of the attention of all courts of a limited jurisdiction is engrossed in ascertaining the causes over which they may legitimately claim cognizance, and the administration of an involved or insolvent succession, from the number of the parties in interest, and the variety of conflicting and complicated claims that are oftentimes exhibited, frequently affords difficult questions of this description.

The supreme court of Louisiana treat the questions arising

upon the records now before us, as difficult and embarrassing, calling for undivided and anxious attention, and much care was employed in deciding them, so as to maintain in that State an accordant system of jurisprudence. The claim of an embarrassed debtor to exhibit the condition of his affairs to a court with a view to obtain its assistance to convoke his creditors, that they may deliberate upon a proposition to grant him a delay or respite, and to bind the minority to the conclusions of a consenting majority, is one which has no recognition in the common law. It was derived in Louisiana from the continental codes of Europe, upon which the legal institutions of that State are founded. The supreme court of Louisiana upon an investigation of those codes, determined that the death of Poultney in a state of insolvency without heirs who were willing to accept his succession unconditionally, and thereby to afford security for the fulfilment of the conditions of the decree of respite which the debtor had assumed, relieved his creditors from their obligations to respect it, and empowered them to proceed, *in rem*, against the estate of their debtor in the hands of a syndic.

The same tribunal, (supreme court of Louisiana,) after tracing the sources of the jurisdiction of the district court, extending, as it did, to " all civil cases," determined that it was not without jurisdiction *ratione materiæ* of a suit against such an estate, and that judgments rendered in that court, were not radically null. They say, "the undisputed exercise of such a jurisdiction for a long series of years, the general acquiescence of the legal profession, the universal understanding among the people, as well as the courts and bar, form together such contemporaneous interpretations of the laws relating to conflicting jurisdictions, that, however doubtful it may appear on a close analysis, it cannot now be disturbed without the greatest injustice, and inflicting incalculable mischiefs on the country." And in Robinett v. Compton, 2 Ann, R. 847, 855, the same court says, " That, previous to the passage of the act of the 18th March, 1820, fixing the jurisdiction of the courts of probate in this State, it seems to have been settled by various decisions of this court that the district courts were not deprived of jurisdiction *ratione materiæ* in such cases. The practice was universal to bring suits against successions in the district court, and we are not prepared to say it was erroneous." And, since the act of 1820, (which, however, was not promulgated so as to be in force when this sale was made,) the court say, " that such judgments in that court might be erroneous, but were not mere nullities." The jurisdiction of the district court to render the judgment being admitted, the further question arises, was the jurisdiction so exercised as to be operative? The supreme court, in the case of Cecil above cited,

determine " that the rules which apply to the sale of minors' property as such, when the title is fully vested in them, are not strictly applicable to a case like the present, where the rights of minors were contingent and residuary, subject to the undoubted claims of creditors *deducto œre alieno*, and who, in this very case, appear as beneficiary heirs claiming property already alienated for the payment of debts," &c. And in McCullough *v.* Minor, 2 Ann, 466, the same court affirm " that in cases like this, the purchaser is not bound to look beyond the decree."

The jurisdiction of the court was undoubted, and the jurisprudence of the State has long since been settled that a *bonâ fide* purchaser at a judicial sale is protected by the decree. 11 Louisa. 68; 13 Louisa. 432; 16 Louisa. 440; 3 Rob. 122. The judgments of the supreme court of Louisiana upon the validity of the sales impugned in this bill were given more than twenty years ago. They have formed the foundation upon which the expectations and conduct of the inhabitants of that State have been regulated. They have quieted apprehensions and doubts respecting a title to an important portion of a large and growing city. They have invited a multitude of transactions and engagements in which the well-being of hundreds, perhaps thousands, of the citizens of that State depend. In this bill there are several hundreds of defendants.

The constitution of this court requires it to follow the laws of the several States as rules of decision wherever they properly apply. And the habit of the court has been to defer to the decisions of their judicial tribunals upon questions arising out of the common law of the State, especially when applied to the title of lands.

No other course could be adopted with any regard to propriety. Upon cases like the present the relation of the courts of the United States to a State is the same as that of its own tribunals. They administer the laws of the State, and to fulfil that duty, they must find them as they exist in the habits of the people, and in the exposition of their constituted authorities. Without this, the peculiar organization of the judicial tribunals of the States and the Union would be productive of the greatest mischief and confusion. Jackson *v.* Chew, 12 Wheat. 153.

But, if we were required to depart from that jurisprudence to find a solution of these difficult and embarrassing questions, we should not have to leave the precedents afforded by this court for the support of many of their conclusions. This court has contributed its share to that stability which results from a respect for things adjudicated: *Status reipublicœ maximé judicatis rebus continetur.*" It is the settled doctrine of the court, that when the proceedings of a court of justice are collaterally drawn

in question, and it appears upon the face of them that the subject matter was within its jurisdiction, they cannot be impeached for error or irregularity; that, if a court has jurisdiction, its decision upon all the questions that arise regularly in the cause are binding upon all other courts until they are reversed. 2 Pet. 157; 1 Ib. 340. And when the object is to sell the real estate of an insolvent or embarrassed succession, the settled doctrine is, there are no adversary parties—the proceeding is *in rem*—the administrator represents the land. They are analogous to proceedings in admiralty, where the only question of jurisdiction is the power of the court over the thing—the subject-matter before them—without regard to the parties who may have an interest in it. All the world are parties. In the orphans' court, and all the courts which have power to sell the estates of decedents, their action operates on the estate, not on the heirs of the intestate. A purchaser claims not their title, but one paramount. The estate passes by operation of law. 2 How. 319; 11 S. & R. 426; 6 Port. 219, 249.

The identity of the principles applied by the supreme court of Louisiana, in ascertaining the effect of the judgments of their courts, and those accepted as true by this court, leaves no question resting upon the authority of the state tribunals, except that of the nature and extent of the jurisdiction of their courts under the organic law of the State. And no principle would authorize this court to dissent from their conclusions on that subject, when the land disposed of was within their borders, and the parties in interest were citizens belonging to their community.

Our opinion is, that the pleas of the defendants afford a complete answer to the bill; and that the decree of the circuit court must be affirmed.