MERCHANTS' & FARMERS' BANK *v.* AUSTIN *et al.*

(*Circuit Court, N. D. Alabama, N. D.*    October 27, 1891.)

BANKS AND BANKING—COLLECTION OF DRAFT—OWNER'S RIGHT TO PROCEEDS IN RECEIVER'S HANDS.

A bank which collects a draft sent to it by another bank for that purpose, with directions to remit the proceeds to a third bank for the owner's account, does not thereby become a trustee, so that the fund can be followed into the hands of a receiver, although it had become mixed with the other cash of the bank before his appointment; especially when it appears that the business was carried on, and money paid out, for several days after the collection was probably made.

In Equity.    Bill by the Merchants' & Farmers' Bank against Richard W. Austin, as receiver of the First National Bank of Sheffield, and others, to recover the proceeds of a draft collected by the latter bank for the former.    Heard on submission for final decree.

*W. H. Bogle, F. Roulhac,* and *Jo. H. Nathan,* for complainant.

*David D. Shelby,* for defendants.

BRUCE, J.    The complainant bank, of Macon, Miss., became the owner of certain bills or drafts drawn at sight by one E. D. Slater on Howell & Co., of Sheffield, Ala.    These bills were sent by the complainant to the First National Bank of Sheffield at Sheffield, Ala., for collection.    There were seven of them, dated from the 7th to the 15th of November, 1889, aggregating in amount the sum of $17,412.25. These bills were sent to the First National Bank of Sheffield about the

time of their dates, with instructions (except as to one of them) to remit to Chemical National Bank, New York, to the credit of the complainant bank. The bills were received by the defendant bank, and it is alleged and claimed to be shown by the evidence that the bills were collected by the defendant bank, which, however, is denied in the answer of Austin to the bill; and the defendant bank drew its drafts for the amount of the bills upon W. L. Moody & Co., bankers, of New York, which drafts were not paid, but were protested for non-payment; and on the 25th of November, 1889, complainant bank, through its agent, demanded payment of the defendant bank, which it failed and refused to make; and on the 29th day of November, 1889, the defendant bank suspended, and never resumed. On the 23d day of December following, Richard W. Austin was, by Hon. E. S. Lacey, comptroller of the currency, appointed receiver of the defendant bank, and took possession of its assets, on the 2d day of January, 1890. He states in his deposition, and it is not questioned, that when he took charge there was a total of $684.46 on hand, all of which were cash items, except $110.95, which was money or actual cash in currency. He says the total amount of assets was—good, doubtful, and worthless—$347,709.98; liabilities, $235,733.23.

The theory of the bill is that the relation of the complainant to the defendant bank was not that of debtor and creditor, nor that, even, of bank and its depositor, but that there was a trust relation subsisting between them; that the complainant bank sent the bills in question to the defendant bank, and employed it as its agent or bailee to collect and remit according to specified instructions; that the defendant collected the bills, and, in violation of its instructions and duty in the matter, mingled the proceeds with the mass of assets of the bank; and the prayer of the bill is for a decree for the amount of its claim, and interest, against the Sheffield bank, making the amount of the claim a first lien on all the assets in the hands of the receiver, superior to that of the general creditors of the bank, and that the receiver be required to pay said claim in preference to the general creditors of the bank. Defendant Austin, in his answer, says:

"It is not true that the proceeds of the said collection passed into the hands of said receiver. It is not true that the said receiver now has, or ever had, the proceeds of said collection."

The first question to be considered is one of fact, rather than of law, and is whether it is established by the proof that the bills in question were collected by the defendant bank, and that, instead of remitting the proceeds of such collection to the Chemical Bank of New York for credit of complainant bank, the defendant bank kept the proceeds of the collection, and turned them over with the other assets to defendant Austin, receiver, and so, as claimed, misappropriated said funds by mingling them with the general assets of the bank, and failing to remit as instructed, or to provide for the payment of the exchange drawn on W. L. Moody & Co., of New York. There is no unqualified statement of the witness Benham, who was the cashier of the defendant bank at the

time, that the bills were paid to his bank in actual money. They were paid, as he testifies, by the checks of Howell & Co.; but neither he nor any other witness says that these checks were actually paid to the defendant bank. He testifies that all the bills were paid by the checks of Howell & Co.; that three of the checks, aggregating $4,635.12, were on the defendant bank, one on the Bank of Commerce of Sheffield for $720, and the other three on the First National Bank of Florence. He says, in reply to cross-interrogatory 7:

"It may be proper to state here that at the time Howell & Co. paid the drafts by checks on First National Bank of Sheffield, as heretofore stated, his account was overdrawn from two thousand to six thousand dollars."

In answer to interrogatory 6, he says:

"I don't remember telling him [Bogle] there were no funds on hand to pay the claim; but, as a fact, the bank did not have at any one time sufficient funds on hand to pay this claim."

H. C. Howell testifies that he did business under name of Howell & Co.; that the bills were paid by checks of Howell & Co. on the Bank of Florence, except one for $750 on the Bank of Commerce of Sheffield. He says: "The original drafts are in my possession, but I decline to attach them, as they are my voucher for these payments." See answer to second direct interrogatory.

The bills in question, then, were paid by Howell & Co.'s checks, whether on the banks, as Howell states, or as Benham states, is not clear; nor is it clear that the proceeds of the collection of the bills were ever actually paid into the defendant bank. Benham does say he collected the drafts, and remitted the same as instructed, and that the "money received was put into the general cash;" but this leaves it in doubt whether the money, or at least a considerable portion of it, was ever actually passed into the defendant bank. But conceding that the money was collected, and put into the general cash of the defendant bank, then what does the evidence show as to what became of it? Or, rather, does the evidence show that the money or its proceeds, or the proceeds in the form of any new investment, passed into the hands of the receiver, Austin?

There is no evidence in the record tracing any of the complainant's money or its proceeds into the hands of Receiver Austin; and, that being so, can the complainant bank, under the rules of law applied to this class of cases, recover as claimed? The general rule is that a *cestui* can follow trust property, but not when mingled with other property so as to be undistinguishable. 2 Morse, Banks, 590; *Case* v. *Beauregard*, 1 Woods, 126. In 2 Pom. Eq. Jur. § 1058, the rule is there stated:

"No change in the form of the trust property effected by the trustee will impede the rights of the beneficial owner to reach it, and to compel its transfer, provided it can be identified as a distinct fund, and is not so mingled up with other moneys or property that it can no longer be specifically separated."

"Moneys collected on a draft by an insolvent bank, acting as collecting agent, cannot be collected in full when the ear-marks or means of identity are gone." Wait, Insolv. Corp. § 659. In a recent case

(*Bank* v. *Goetz*, 27 N. E. Rep. 907) the supreme court of Illinois state the rule thus:

"The doctrine is that trust funds can only be pursued when they can be clearly distinguished from the other property held by the trustee, or by those representing him;" citing authorities.

Many cases and much authority have been cited by the counsel of the respective parties in this case, which it is not deemed necessary to examine at length. But the cases of *Bank* v. *Armstrong*, 42 Fed. Rep. 193, and of *Bank* v. *Dowd*, 38 Fed. Rep. 172, are much in point, and sustain the rule as stated *supra*. It is claimed, however, that the doctrine and rule on the subject have been modified by the decisions of the supreme court of the United States in recent cases, and that in cases of this kind the complainant is not required to trace the money, property, or proceeds into the hands of the receiver, but only to show that it, in one form or other, passed with the mass of the assets of the bank into the receiver's hands; as it is phrased in one or more of the cases, that it was put into the bag, and then the court will take it out of the bag, or will hold the whole contents of the bag as trust funds, at least until the trustee shall show that what he claims is no part of the particular fund claimed. In the case of *Peters* v. *Bain*, 133 U. S. at page 693, 10 Sup. Ct. Rep. 361, the court says:

"Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful conversion a priority of right over the other creditors of the possessor."

The case then under consideration by the court was not like the case at bar. It was a case where the individual partners in a private bank were also directors in a national bank, and by reason of their position became possessed of a large part of the means of the national bank, which they used in their own business. They assigned all their property to trustees for the benefit of their creditors. The national bank also suspended, and went into the hands of a receiver. On the face of it, there would be conflict between the trustees in the deed of assignment, whose assignors had become possessed, as the court states, of a large part of the means of the national bank, which they used in their own business, and the receiver of the national bank, which had been defrauded by its directors for their own benefit. The suit was by the receiver in that case, and his contention was sustained as to property shown to have been purchased with the moneys of the bank; but he claimed also property purchased with moneys which were not identified as belonging to his bank; and the court says, on page cited *supra*, in reference to that claim:

"The difficulty of sustaining the claim in the present case is that it does not appear that the goods claimed, [by the receiver,] that is to say, the stock on hand, finished and unfinished, were either in whole or in part the proceeds of any money unlawfully abstracted from the bank."

And on pages 678, 679, 133 U. S., and page 357, 10 Sup. Ct. Rep., in same case, the court say:

"Some of the money of the bank may have gone into the fund, but it was not distinguishable from the rest. The mixture of the money of the bank with the money of the firm did not make the bank the owner of the whole. All the bank could in any event claim would be the right to draw out of the general mass of money, so long as it remained money, an amount equal to that which had been wrongfully taken from its own possession, and put there. Purchases made and paid for out of the general mass cannot be claimed by bank unless it is shown that its own moneys then in the fund were appropriated for that purpose."

If, then, a receiver of a national bank, in a suit in which he is complainant, must trace and show that the money of his bank was used in the purchase of specific property, when the suit is against the receiver will a different rule be applied? Or will not the complainant be required, as in the case cited, to show not only that the money went into the complainant bank, but that it is still there, or, if used in the purchase of specific property, that the new investment is in the hands of the receiver? So that this case is really against the contention of complainant in the case at bar. Other cases are cited and relied on to support what is claimed to be the new or modified rule. In one of these cases (*McLeod v. Evans*, 66 Wis. 401, 28 N. W. Rep. 173, 214) the rule is there stated. We do not understand that it is necessary to trace the trust fund into some specific property in order to enforce the trust. If it can be traced into the estate of the defaulting agent or trustee, this is sufficient. The complainant insists that the case at bar falls within this rule, and the line of authorities cited in support of it; that is, that it is shown that the complainant's money was paid into the bank, which afterwards suspended, and was mingled with the general assets now in the hands of a receiver; and therefore, without showing more, he is entitled to the right of a preferred creditor of the bank.

It is claimed that this rule is supported by the supreme court of the United States in *National Bank* v. *Insurance Co.*, 104 U. S. 54, when the court says:

"There is no difference between investments in the purchase of lands or chattels or loans or money deposited in bank; * * * for equity will follow the money even if put into a bag, or an undistinguishable mass, by taking out the same quantity."

The facts in the case, however, show it very unlike the case at bar. It is the statement of a general principle of equity, which has little, if any, application to this case. There are no doubt cases where a court of equity will follow money even if put in a bag, and take out the same quantity as was wrongfully put in, but the rule in the case of *McLeod* v. *Evans*, cited *supra*, goes beyond this, and must do so to sustain the case at bar. There the proposition is not simply to take out money, as in *National Bank* v. *Insurance Co.*, but that it is not necessary to trace the fund into specific property, but only into the estate of the defaulting agent or trustee, which it is insisted has been done in this case. The ground on which this rule seems to be based is that the fund which has been misapplied goes to increase the *corpus* of the trust-estate, and swell the assets, and that to take the same quantity out of the general assets

of the estate would leave all that the general creditors are entitled to, and would not therefore injure them. In the case of a trust-estate in the hands of an agent or trustee, from which nothing was going out, and from which nothing was abstracted, and no opportunity for loss, and to which something had, by misapplication of the agent or trustee, been added, it may be assumed that in such a case the rule as claimed might well be applied. But that is not the case, or a question such as we have under consideration here. When the bills in question were collected by the defendant bank, which was doubtless insolvent at and before that time, its doors were not then closed, but the business was carried on up to the 29th; and we have a statement of the witness Benham, cashier, as to the business of the bank each day from the 21st to the 29th November, when the doors were closed; and, in answer to cross-interrogatory 6, among other things he says:

"I paid out small checks until the bank closed; for, if I had refused their payment, there would have been a run on the bank at once, and my cash would have been diminished accordingly."

In the light of this and other testimony, it scarcely admits of doubt that the collections made by the defendant bank on complainant's bills, whatever they may have been as to amount, between the date of the collections and the 29th, when the suspension took place, were paid out on the small checks he speaks of. It may be said the bank got the benefit of these payments of checks, because that was the cancellation of just so much indebtedness; but is it shown that the payments were not made on overdrafts by insolvents, and how is it shown that the accounts on which checks were drawn and paid were not the proceeds of discounts of insolvent paper, or something of that kind? This bank failed and suspended. There must have been a cause for it. On the letter-heads the capital stock is stated to be $100,000; paid-up and undivided profits, $20,000. In answer to cross-interrogatory 5, Benham, cashier, says:

"It is true that over $50,000 was invested in bank building, furniture, and lots. It is true that one Woodson owed the bank between $48,000 and $50,000,—overdrafts, about $23,000; notes, about $15,000."

And in answer to direct interrogatory 6, after giving an account of the business of the bank from November 21st to November 29th, when the bank closed, he says:

"Balance to start with, [that is, on the 29th,] $8,023.19; credits in cash-book, $73,584.30; disbursements or debits, as above, by cash-book, was $81,203.58; leaving a balance of $403.91."

Then follows an explanation as to how the books were kept, too long for insertion here, and he concludes his answer by saying:

"The large amount of disbursements and receipts on November 29, 1889, arises from the large amount of offset entries, in which Charles D. Woodson overdrew his personal account, and had a greater portion of the amount placed to the credit of other accounts."

The witness does say, in answer to fourth interrogatory:

"I don't know that the bank suffered any losses after these papers were sent by complainant to the bank."

And there is no direct proof of the losses of the bank, or when they occurred. It is not even in proof that the estate of Charles D. Woodson, the president of the bank, was and is insolvent, though it is in proof that his notes to the bank and his overdrafts to the amount of about $50,000 are unpaid, and are now in the hands of the receiver, Austin. Benham says: "I did not know it [the bank] was insolvent at the time, because I was not aware of facts which have since come to my knowledge." It is, no doubt, difficult, in cases of this kind, to determine the time at which a bank becomes actually insolvent beyond the just hope of recovery; but the evidence here is not alone the allegation of hopeless insolvency contained in the bill, and not denied, but other evidence in the record shows that at and prior to the time the bills were received by the defendant bank for collection its affairs were in a critical condition, and that, whatever may be said as to the other officers and directors of the bank, at least the president, Woodson, knew its actual condition to be that of hopeless insolvency. Not only so, but, on the very day the bank closed, Woodson overdrew his personal account, and credited the amount to other accounts. See testimony of Benham, cited *supra*. Whatever this and other testimony may mean,—for some of it is neither full nor definite in statement,—it is clear that Woodson not only knew, but in violation of his trust, and for his own benefit, contributed to the failure and suspension of this bank.

This is not a case for the application of the rule invoked here by the complainant. To recur to the illustration of the trust-estate being in the bag, and that a court of equity will put its hand into the bag, and take out the same quantity as that which, by a misapplication, the trustee put in. This bag is not shown to have been closed and inviolate, but it appears that the money was going out as fast as it was put in, and the collection of complainant's bills did not in fact increase the general assets of the bank, but, rather, that they were part and parcel of the funds which were lost in the wreck of the bank. In the case of *Railroad Co.* v. *Johnston*, 133 U. S. 577, 10 Sup. Ct. Rep. 393, the court says, quoting with approval:

"A banker who is, to his own knowledge, hopelessly insolvent, cannot honestly continue his business, and receive the money of his customers, and, although having no actual intent to cheat and defraud a particular customer, he will be held to have intended the inevitable consequences of his own act to cheat and defraud all persons whose money he receives, and whom he fails to pay, before he is compelled to stop business."

In the light of this authority, the officer responsible for continuing the business of this bank after hopeless insolvency had supervened, which must have been known at least to the president of the bank, was committing a fraud in receiving the money of innocent depositors and others ignorant of its true condition. The complainant bank was the victim of this fraud, as well as others, who had all been alike misled and deceived by the apparent solvency and good credit of the bank. But, in a legal or moral point of view, was the fraud any deeper or more flagrant upon the complainant than upon the other creditors of the bank?

It is insisted that the relation of the complainant and defendant bank was that of principal and agent; that the complainant bank, by its instructions to collect and remit, never agreed, by any implication, to stand on any other than a strictly fiduciary relation; and that such relation is a different one, and one of higher trust, so to speak, than the relation of a depositor or other debtor of the bank. We have seen that the authorities do not sustain this distinction as a ground for a preference in the distribution of the general assets of a broken bank; and, upon principle, can such a preference be maintained? It is common, every-day business for banks to employ each other as collection agencies; and they perform this duty in no exceptional way, but in the same manner in which they do the general business of the bank. A bill is collected by a bank, and the proceeds mingled with the general assets, so as to be entirely undistinguishable, and with no ear-marks or means by which it can be identified or traced into any new investment. The bank breaks. Now, on what principle does he stand on other or higher ground than he who, with faith in the solvency of the bank, deposits his money and loses it? The contention here is not supported either by sound reason or authority.

Another question is made and argued in the case. It is that section 5236 of the Revised Statutes of the United States, in chapter 4, in reference to the dissolution and receivership of national banks, stands in the way of complainant's contention here. If, however, the views expressed are correct, they are decisive of the case, and this question need not be discussed. The bill is dismissed, with costs.