INDEPENDENT DISTRICT OF PELLA v. BEARD.

(Circuit Court, S. D. Iowa, C. D. September 17, 1897.)

FEDERAL AND STATE COURTS—RULES OF PROPERTY—INSOLVENT BANK—RIGHTS OF DEPOSITORS.

   It has been established by the supreme court of Iowa that, in order to fasten a special trust upon funds held by the receiver of an insolvent bank in that state, it is not necessary to trace the deposit into any specific property in his hands, but that it is sufficient to show that the estate in his hands has been augmented by the trust fund in question. *Held*, that this constitutes such a rule of property as to be binding on the federal courts.

This was a suit by the Independent District of Pella against R. R. Beard, receiver of the First National Bank of Pella, to establish a preferred claim against the funds in the hands of the receiver.

Earle & Prouty and P. H. Bosquet, for plaintiff.
Cummins, Hewitt & Wright, for defendant.

WOOLSON, District Judge. The bill herein in substance avers that the treasurer of the plaintiff district from time to time deposited in the First National Bank of Pella funds belonging to plaintiff, and that on the 1st day of June, 1895, the said funds so deposited amounted to $4,676.25, said funds being taxes duly collected for plaintiff, and by said treasurer paid into said bank, which funds were credited on the books of said bank to said district treasurer; that on said June 1st said bank was declared insolvent, and taken possession of by the government; that defendant, Beard, was duly appointed receiver, and took possession of the assets of said bank, including the said funds so paid in by said district treasurer; that, under the laws of the state of Iowa, said district treasurer had no authority to so deposit said funds with said bank, as the officers of said bank at the time well knew, and said officers also knew said funds to be public funds, the property of plaintiff, at the time said funds were so received and paid into said bank; that it was the duty of said officers of said bank, under said recited facts, not to mix said funds with the general funds of said bank, but said bank, by its said officers, did unlawfully convert said funds to its own use, and did unlawfully increase its assets by mixing said funds therewith; that ever since said funds were so left with said bank by said district treasurer the amount thereof was in the possession of said bank up to the time said bank was so closed and taken possession of by the government; that at said closing there was on hand in said bank the sum of $8,000, which was composed in part of said $4,676.25, to wit, said funds so deposited by said district treasurer; that the whole of said cash came into the hands of the defendant receiver; that said funds, so deposited by said district treasurer, became and were, in the hands of said bank, a trust fund, and, as such, passed into the hands of said receiver; that said trust funds are the property of plaintiff, and never became the property of the said bank, and plaintiff has a preferential claim thereto, and is entitled to, and prays, decree establishing same, and ordering said receiver to pay same as such. The receiver, in his answer, substantially admits all the facts pleaded in the bill,—that is: The deposit by the treasurer of plaintiff of funds belonging to plaintiff. That the officers of said bank knew such funds to be public funds, belonging to plaintiff. That on June 1, 1895, and at the date when the receiver took possession, said bank was indebted to plaintiff in the said sum of $4,676.25, as balance due on deposit account. The alleged insolvency and closing of said bank on said June 1st, and the appointment of, and taking possession by, said receiver. But said receiver denies any unlawful conversion of said funds; denies said balance is a trust fund in his hands; denies said funds so deposited by said district treasurer were in said bank at its said closing, or that any part thereof came into his hands as receiver; avers the methods of depositing in said bank, by said treasurer, of plaintiff's funds, had, for many years prior to said June 1, 1895, been continuously the same, and the account of said funds had by said bank been entitled "Treasurer of Independent School District," and said funds had been so deposited generally, and not specially, and had been continuously mingled with the general funds of said bank, and checked therefrom by said treasurer as a general account. That all the funds

so paid in and deposited by said treasurer had, at time of said closing, been checked out, and the cash then on hand contained no part of the funds which had been so deposited by said treasurer.

The issues of fact herein are very few. The main contentions arise on the law applicable, and its application. The following facts appear, either in the agreed statement of facts, or the evidence supplementing the same: The First National Bank of Pella was duly organized and acting under the statutes providing for such banks, with its place of business at Pella. Said bank was insolvent for more than a year prior to June 1, 1895. On said June 1st said bank was closed, and possession thereof duly taken by the government. Defendant, Beard, was duly appointed receiver thereof, and took possession of its assets. On said June 1st, the cash assets of the bank were $8,729.93, which passed into said receiver's hands. The Independent District of Pella is a duly-organized school district, and, under the laws of the state of Iowa, competent to sue. For years prior to said June 1st, the treasurer of said district was accustomed to deposit in said bank the funds of said district, as the same came into his hands. Such deposits were not made as special deposits, but were paid into said bank as general deposits, and intermingled with the bank's general funds. The account of said deposits was kept in the books of said bank under the heading of "Treasurer of Independent School District." The treasurer from time to time checked against this account, as is the custom of depositors generally, and at times, by an arrangement between said treasurer and the bank officials, funds were paid from the bank on warrants of the district signed by the president and secretary, addressed to the district treasurer; these warrants, by such agreement, being regarded, when presented to the bank, as checks by the treasurer, and being accepted by him as vouchers for payment by the bank. No interest was paid on the account of said funds so deposited or remaining on hand. No request was ever made that any of such deposits be held as special deposits or funds. No resolution or action of the board of directors of plaintiff authorized or directed said deposits to be made by said treasurer. The officers of said bank knew, at the time said deposits were being made, that the same were the funds of plaintiff. Said deposits were not always made in money, but some portion—how much is not shown—was made in checks or drafts, which were received by said bank, and credited in the treasurer's said account as cash. During the entire period covered by said deposits by said district treasurer, and up to the closing of said bank, there was in said bank in cash more than the said sum of $4,676.25, and the daily balance of cash on hand in said bank, as shown by the cash register of the bank for each day, exceeded the balance so shown as due the district treasurer on that day. The balance, as shown by the books of the bank, owing by said bank on said June 1st, on the said account of "Treasurer of Independent School District," and when said receiver took charge, was $4,676.25, which sum is due from said bank to plaintiff. On May 11, 1895, the balance due from said bank on said account was $707.45. On May 13, 1895, a deposit was made by said treasurer of $4,340.30, which was carried on the books of the bank, and credited to him, in the said account

whose heading is given above. At the trial it was agreed by the parties that no part of this deposit of $4,340.30 was made in cash, but that the same was made by the deposit of a check or order of the county treasurer, whereby a charge of said sum was made to such county treasurer's account, wherein the bank was owing him, and a corresponding credit placed in the account of the district treasurer. Evidence was offered showing that the two deposits (May 6, 1895, $614.-40, and Feb. 14, 1895, $310.11) next preceding the said deposit of May 13th were not made in cash, but were also made by transfer of credits, through check, etc. The bank was open and doing business each week day from said May 13th up to its said closing, on June 1st. The treasurer drew against this account, viz.: on May 15th, $58.70; May 17th, $51.50; May 18th, $37.70; May 20th, $8.50; and on June 1st, $215. The balance of cash assets on hand in the bank on said May 15th was $8,838.82. Between that day and the closing of the bank, the largest daily balance of cash assets in the bank was, on May 28th, $10,967.46, and the smallest daily balance June 1st, $8,729.93. On said May 13th, according to the daily cash register of the bank, there was deposited in said bank $8,297.43, which includes the treasurer's deposit of $4,340.43. Other transactions of that day are entered in said cash register, amounting to $977.05,—a total cash assets or receipts of $9,274.48. Said cash register shows on said May 13th, as paid out to depositors, $7,987.92, and other transactions charged as $800, making a total of, apparently, cash paid out on said May 13th of $8,787.92. The next day, May 14th, said cash register shows, received from depositors, $5,565.40, and from other sources, $1,920.36,—a total of $7,485.76; and, on same day, paid out to depositors, $3,066.20, and to others, $5,027.42,—a total paid out of $8,-093.62. From said May 13th to the following June 1st, inclusive, the largest total shown on the cash register as paid out to depositors is on May 13th, as above given, while the smallest amount as shown is on May 21st, where such amount is $4.8.50. The next smallest is May 28th, $1,065.90. The daily receipts from depositors shown during that entire period aggregate $41,580.18, or average daily receipts of $2,445.89. During the same period, the payments so shown to depositors aggregate $43,123.39, or average daily payments of $2,536.67. The cash receipts, as shown by said cash register, from other sources than depositors, aggregate, during said period, $32,895.18, being a daily average of $1,935.01; while the cash payments to others than depositors aggregate, as so shown, $30,569.51. being a daily average of $1,857.03. Taking the entire cash receipts for said period, as so shown, we have an aggregate of $74,475.36, or a daily average of $4,-380.90; while the entire cash payments so shown for such period aggregate $73,692.90,—a daily average of $4,334.88. What part of these apparently "cash" receipts and payments were actually made in cash the evidence does not disclose.

I have stated thus fully the facts as they appear in the evidence, for the purpose of enabling counsel, and at their request, to present their views fully thereon should the case be reviewed on appeal, as I doubt not it will be. On these facts, the question whose solution must determine the decree to be rendered is whether the balance

shown to be due the plaintiff is to be regarded as so traced into the cash in defendant's hands as a trust fund, as that plaintiff is entitled to have the same paid in preference to the general creditors of the bank. If, under the law to be applied thereto, the deposits made by the district treasurer are so traced into the cash assets received by defendant, as assets of the bank, as that plaintiff is taken out of the class of general creditors, and given a special and superior right or claim on such cash assets, decree must pass for plaintiff for the full balance due it from the bank; otherwise, the bill must be dismissed, and plaintiff remitted to share with the other general creditors.

This question is not easily decided. Counsel upon either side have referred the court to many cases sustaining the contention of counsel citing them. This conflict of decision is marked and irreconcilable. In many of the cases, the court delivering the decision has attempted to distinguish the case then under consideration from other cases wherein a contrary view of the law was held. Generally such attempts have not been satisfactory. Not only have the highest courts of the states arrayed themselves on one side or the other of the law as decisive of the cases before them, but the circuit courts of the United States are found with antagonistic views on the general proposition as to what is necessary to enable trust funds to be so successfully traced as that a preferential claim therefor can be maintained. In many of the cases, notably those to which counsel have referred as decided by the supreme court of the United States, the decision has turned, or been largely affected, by the existing relations of principal and agent, and by the fact that property in the draft, account, or the like, out of which the trust relation sprang, remained in the one claiming the trust funds, and never passed to the party against whom this claim was made. While the reasoning underlying such decisions is instructive, and may assist in determining what the law decisive of this suit is, as between conflicting decisions cited from different jurisdictions, they do not seem to settle the question here to be decided, since the facts on which these decisions passed differ so radically from those in the case at bar.

In Frelinghuysen v. Nugent (1888) 36 Fed. 229, 239, Justice Bradley, sitting in the circuit court of the district of New Jersey, had occasion to consider the general question with respect to the facts then before him. That case presented a complicated array of facts. The receiver of a national bank was seeking to follow into certain property (certain material and finished stock) moneys abstracted from the bank. In considering the matter, the learned justice says:

"Another difficulty in the complainant's case is the want of identity of the property claimed with the proceeds of the money abstracted from the bank. Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended on the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale; but if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the

party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried."

Passing to the application of these views to the facts·before him, he says:

"The difficulty of sustaining the claim in the present case is that it does not appear that the goods claimed—that is to say, the stock on hand, finished and unfinished—were, either in whole or in part, the proceeds of any money unlawfully abstracted from the bank. On the contrary, the goods and stock on hand were purchased of the other creditors of Nugent & Co., almost entirely, if not wholly, on credit, and really stand in place of, and represent the debts of, the firm due and owing to said creditors. This is true with regard to all the raw stock on hand, and with regard to all the stock and materials from which the manufactured or partially manufactured goods were produced. If any moneys derived from the bank entered into the latter, they were those moneys which were regularly drawn by checks of the firm weekly for the payment of their hands. It seems impossible, therefore, to sustain any general charge or trust upon the goods or property of Nugent & Co. as that which has been set up and claimed by the complainant."

National Bank v. Insurance Co. (1881) 104 U. S. 54, is cited by counsel·upon each side. The facts in that case distinguish it from the case at bar. There one Dillon, the general agent of an insurance company, opened an account as general agent with the bank, and his account was entitled as with him as general agent. While he from time to time deposited some of his private funds in this account, such deposits were of comparatively minor amounts. His current deposits included checks, etc., for premiums, which he indorsed as general agent. His checks on the account were signed as general agent. In closing his account, the bank charged against it an amount which substantially wiped out the credit then due him. This charge consisted of a private debt due the bank from Dillon. He was then owing the company, as its general agent, an amount equal to that wiped out by the bank. The insurance company sued the bank, claiming the deposit as general agent constituted a trust fund, against which the bank could not charge Dillon's private debt. The supreme court sustain this claim, distinguishing the right of the bank to pay out on Dillon's check (even though the funds thus obtained were used by him for his private business) from the right of the bank to set against the funds, of whose trust character the court found the bank had notice, a private debt due from Dillon to it. The argument of the court in reaching the decision must be considered as applied to the facts before it. Thus applied, the case fails to supply us with decisive authority for the case at bar.

Peters v. Bain (1890) 133 U. S. 670, 694, 10 Sup. Ct. 354, refers to National Bank v. Insurance Co., supra, as recognizing and applying the rule laid down by Justice Bradley in Frelinghuysen v. Nugent, supra; and, applying the same principle in that case, the court, through Chief Justice Fuller, finds the claim that trust funds then under consideration had been successfully traced to certain property. was not sustained by the proof. That branch of the general question which must decide this case at bar is not stated or considered.

Bank v. Armstrong (1893) 148 U. S. 50, 13 Sup. Ct. 533, and Evansville Bank v. German-American Nat. Bank (1895) 155 U. S. 556, 15 Sup. Ct. 221, relate to matters of collection, with consideration of the

relations of principal and agent, and do not touch on the special question to be herein decided.

Turning to the other cases cited by counsel, we find no decision of the circuit court of appeals of this circuit on the point under consideration. While Justice Brewer (then circuit judge of this circuit) in Schuler v. Bank (1886) 27 Fed. 424, 427, refers to the principle involved, he does not amplify his views, but merely remarks:

"So, also, I think there is some room for the application of the principle that, where a fund can be traced, equity will follow it.' I do not mean to say that there is the fullest room for the application of that principle."

And he then proceeds to trace, under the facts before him, the proceeds of a note, through checks, remittances, etc.

A careful reading of the cases decided by the circuit courts of appeal and the circuit courts in the different circuits emphasizes the suggestion heretofore made as to diversity of views and irreconcilable decisions with reference to the extent and particularity with which funds must be traced before equity will decree a preferential claim. So far as this tracing relates to the purchase of property, the federal and state courts appear to hold consistently to what has long been the established rule, and to require satisfactory proof that the trust funds went into the property, so that such property may equitably be regarded as standing in place of the trust funds. The divergence of opinion arises where money held in trust, or properly to be considered as trust funds, has been confused with other funds, mixed in a general mass of funds.

Counsel for the receiver has called the attention of the court to a large array of cases wherein is stated, with more or less directness, the principle which he claims must decide this case for defendant. Among these are the following from the state courts: McClure v. Commissioners (Colo. Sup.) 34 Pac. 763; Holden v. Piper (Colo. App.) 37 Pac. 34; Silk Co. v. Flanders (Wis.) 58 N. W. 383; Gianella v. Momsen (Wis.) 63 N. W. 1018; Burnham v. Barth (Wis.) 62 N. W. 96; Sherwood v. Bank (1892; Mich.) 53 N. W. 923; Sherwood v. Bank (1894; Mich.) 61 N. W. 352; Lebanon Trust & Safe-Deposit Bank's Assigned Estate, 166 Pa. St. 622, 31 Atl. 334; Little v. Chadwick, 151 Mass. 109, 23 N. E. 1005; Slater v. Oriental Mills (R. I.) 27 Atl. 443; Shields v. Thomas (Miss.) 14 South. 85; Goldthwaite v. Ellison (Ala.) 12 South. 812. Counsel for receiver also cites from the federal courts the following: National Bank v. Insurance Co., 104 U. S. 54; Illinois Trust & Savings Bank v. First Nat. Bank (1883; Wallace, J.) 15 Fed. 858; Bank v. Armstrong (1888; Jackson, J.) 36 Fed. 59; Bank v. Dowd (1889; Seymour, J.) 38 Fed. 172; Bank v. Armstrong (1889; Jackson, J.) 39 Fed. 684, affirmed in 148 U. S. 50, 13 Sup. Ct. 533; Bank v. Austin (1891; Bruce, J.) 48 Fed. 25; Wasson v. Hawkins (1894; Baker, J.) 59 Fed. 233; Multnomah Co. v. Oregon Nat. Bank (1894; Bellinger, J.) 61 Fed. 912; Spokane Co. v. First Nat. Bank (1895) 16 C. C. A. 81, 68 Fed. 979, affirming decree below; City of Spokane v. First Nat. Bank (1895) 16 C. C. A. 85, 68 Fed. 982, reversing decree below; Association v. Clayton (1893) 6 C. C. A. 108, 56 Fed. 759, affirming decree below. Some of the de-

cisions cited sustain, in the strongest language, the position of counsel for receiver. It must be conceded that the proof as to the continued receipts and disbursements by the Pella bank during the period following the deposit by plaintiff's treasurer, on May 13th, and to the closing of the bank, is of great force as applied to the reasoning presented by counsel for receiver. In that period the aggregate receipts by the bank of cash assets are shown to have been $74,475.36, and disbursements, $73,692.90; while on said May 13th the cash assets of the bank, after receipt of said deposit by plaintiff's treasurer, were but $8,436.27. The presumption, indulged in by some of the cases cited for plaintiff, that in paying out money the officers of the bank did not pay out any trust funds, but, keeping those funds, paid out the other funds, takes on the hue of fiction, rather than presumption, under the proof that all the cash received on deposit was mingled into one general mass in the bank, and thus increased or lessened as deposits or disbursements compelled the moving of cash.

Among the cases cited by counsel for plaintiff are the following from the courts of different states: McLeod v. Evans, 66 Wis. 401, 28 N. W. 173 (but this appears to be overruled by Silk Co. v. Flanders [Wis.] 58 N. W. 383); Peak v. Ellicott, 30 Kan. 161, 1 Pac. 499; Bank v. King, 57 Pa. St. 202; Harrison v. Smith, 83 Mo. 210; Bank v. Weems, 69 Tex. 489, 6 S. W. 802; Stoller v. Coates, 88 Mo. 514; People v. City Bank of Rochester, 96 N. Y. 32; Yarnell v. Los Angeles, 87 Cal. 603, 25 Pac. 767; Shields v. Thomas (Miss.) 14 South. 84; Association v. Austin (Ala.) 13 South. 908; Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504; State v. Foster (Wyo.) 38 Pac. 926; Independent Dist. v. King, 80 Iowa, 498, 45 N. W. 906; District Tp. of Eureka v. Farmers' Bank of Fontanelle (Iowa) 55 N. W. 343. Also the following decisions by the federal bench: National Bank v. Insurance Co. (1881) 104 U. S. 54, 71; Frelinghuysen v. Nugent (1888) 36 Fed. 229, 241 (being portion extracted, supra); San Diego Co. v. California Nat. Bank (1892; Ross, J.) 52 Fed. 59; Knight v. Fisher (1893; Butler, J.) 58 Fed. 991 (decision affirmed in 9 C. C. A. 582, 61 Fed. 491; but the point now under consideration does not appear to have been discussed); Massey v. Fisher (1894; Butler, J.) 62 Fed. 958; Wasson v. Hawkins (1894; Baker, J.) 59 Fed. 233; Oil Co. v. Hawkins (1896) 20 C. C. A. 468, 74 Fed. 395, reversing decree below.

An examination of the cases cited readily shows their irreconcilable character. Counsel readily agree this far: That if the cash assets, with which were mingled the deposits (assuming them to be cash) made by plaintiff's treasurer, had been paid out or dissipated, and the funds entirely exhausted, that plaintiff could not recover. But plaintiff claims that, since there was continuously on hand, as cash assets, an amount exceeding such deposits, there is a sufficient tracing of such deposited funds to sustain, under the modern rules of equity, plaintiff's right to recover; while defendant, denying the existence of such rules to the extent thus asserted by plaintiff, insists that the transactions of the bank from day to day, after such deposits were made, refute the claim of plaintiff that there is any

such tracing into the receiver's hands, but, on the contrary, sustain defendant's claim that such daily transactions destroy whatever tracing might otherwise exist,—in other words, defendant's attitude apparently concedes that, had the bank closed on the day the deposit of May 13th was made, and the receiver then taken possession, such tracing might be sufficient; but defendant strenuously maintains that the daily transactions thereafter at the bank, and up to its closing, on June 1st, destroy such tracing. Defendant concedes, further, that if the rule announced by the supreme court of Iowa in Independent Dist. v. King, 80 Iowa, 498, 45 N. W. 908, and reaffirmed in District Tp. of Eureka v. Farmers' Bank of Fontanelle, 55 N. W. 343, is to control, decree herein must pass for plaintiff. In the latter case, the court summarize what was held in the former:

"In Independent Dist. v. King, 80 Iowa, 498, 45 N. W. 908, the identical money deposited was not shown to have been delivered to the assignee, and it was said that, if a trust for the amounts deposited were established, 'it must be on the ground that the deposits must be held to have increased the estate of the insolvents, and that the balance due is represented by an increase now in the hands of the assignee.' It was further held that, the money having been traced into the estate of the insolvents, impressed with the character of a trust fund, the burden was upon the assignee to show that it contributed nothing to the estate which he acquired by virtue of the assignment."

Proceeding to apply these principles to the Bank of Fontanelle Case, the court say:

"We do not think it is necessary to trace the deposit into any specific property in the hands of the assignee in order to establish a trust, but it should be shown, presumptively, at least, that the estate in his hands has been augmented by the trust fund."

If this rule is to be applied to the case at bar, decree must be for plaintiff.

Defendant contends that this court is not required to follow the decisions of the supreme court of Iowa as given in the cases above cited; in other words, that there is no statute law, no local custom or usage, and no rule of property therein involved, which is binding on this court in the present action. It is undoubtedly true that the United States courts sitting as courts of equity have a freedom of action in this respect which they do not possess as courts of common law, and that, as a general proposition, the equity jurisdiction of the federal courts cannot be limited or restrained by a state. Green v. Creighton, 23 How. 90; Payne v. Hook, 7 Wall. 430; Ridings v. Johnson, 128 U. S. 212, 9 Sup. Ct. 72; Mississippi Mills v. Cohn, 150 U. S. 202, 14 Sup. Ct. 75. But these decisions relate to the practice, the impairing of jurisdiction, rather than to the determination of the rights of parties after jurisdiction has been acquired.

In Brine v. Insurance Co., 96 U. S. 627, Mr. Justice Miller, in delivering the opinion of the court, considered, as applied to the facts of that case, substantially the views on this point as urged by counsel in case at bar. The main question therein involved was the extent to which the statutory right of redemption, as construed by the state court, was binding on the federal courts. It was contended that:

"Not only do the manner of conducting the sale under decree of foreclosure, and all the incidents of the sale, come within the rules of practice of this court, but that the effects of such sale on the rights acquired by the purchaser, and those of the mortgagor and his subsequent grantees, are also mere matters of practice, to be regulated by the rules of the court," etc.

The court declare adversely to this contention, and state, in substance, that if the converse of this contention is "in conflict with the general doctrine of the exemption from state control of the chancery practice of the federal courts, as regards mere forms of procedure, they are of paramount force, and the latter must, to that extent, give way." Proceeding to inquire "if the statutes of Illinois on the subject do confer positive and substantial rights in this matter," the opinion finds such rights to exist, and the decree of the court below is reversed.

In the course of the opinion, it is said:

"We are not insensible to the fact that the industry of counsel has been rewarded by finding cases even in this court in which the proposition that the rules of practice in the federal courts in suits at equity cannot be controlled by the laws of the states is expressed in terms so emphatic and so general as to seem to justify the inference here urged upon us. But we do not find that it has been decided in any case that this principle has been carried so far as to deny to a party in those courts substantial rights conferred by the statutes of a state, or to add to, or take from, a contract that which is made a part of it by the law of the state, except where the law impairs the obligations of a contract previously made."

To the claim that this refers only to statutory provisions, reference may be had to Chicago v. Robbins, 2 Black, 418, 428, wherein it is said:

"Where rules of property in a state are fully settled by a series of adjudications, this court adopts the decisions of the state courts; but, where private rights are to be determined by the application of common-law rules alone, this court, although entertaining for state tribunals the highest respect, does not feel bound by their decisions."

In Suydam v. Williamson, 24 How. 427, 433, the court say:

"The power to establish federal courts, and to endow them with a jurisdiction to determine controversies between certain parties, affords no pretext for abrogating any established rule of property, or for removing any obligation of her citizens to submit to the rule of the local sovereign. * * * It behooves every other state to enforce or maintain rights which have thus originated in laws operating within their legitimate sphere, and which defeat no policy of their own; and the jurisprudence of this court attests the care with which this court has observed the general obligation in its administration throughout the Union."

With approval, the court quote from Jackson v. Chew, 12 Wheat. 162, the following:

"The inquiry is very much narrowed by applying the rule which has uniformly governed this court, that, where any principle of law establishing a rule of real property has been settled in the state courts, the same rule will be applied by this court that would be applied by the state tribunals."

The judicial interpretation by the state courts of the state statutes, and their application in cases involving statute of frauds, is followed by the federal courts. De Wolf v. Rabaud, 1 Pet. 476; Caldwell v. Carrington, 9 Pet. 86. So as to assignments for creditors and deeds of assignment. Allen v. Massey, 17 Wall. 351; Jaffray v. McGehee, 107

U. S. 361, 365, 2 Sup. Ct. 367; Randolph's Ex'r v. Quidnick Co., 135 U. S. 457, 10 Sup. Ct. 655; May v. Tenney, 148 U. S. 60, 64, 13 Sup. Ct. 491; Chicago Union Bank v. Kansas City Bank, 136 U. S. 223, 10 Sup. Ct. 1013,—where it is said:

"The question of the construction and effect of a statute of a state, regulating assignments for the benefit of creditors,· is a question upon which the decisions of the highest court of the state, establishing a rule of property, are of controlling authority in the courts of the United States. * * * If, therefore, different interpretations are given in different states to a similar local law, that law, in effect, becomes, by the interpretations, so far as it is a rule for our action, a different law in one state from what it is in the other."

As was said by Mr. Justice Brewer in Lumber Co. v. Ott, 142 U. S. 627, 12 Sup. Ct. 320:

"The rights of the parties are determined by the local statute, and the construction placed thereon by the supreme court of the state is decisive. The question of the construction and effect of a statute of a state regulating assignments for the benefit of creditors is a question upon which the decisions of the highest court of the state, establishing a rule of property, are of controlling authority in the courts of the United States."

So, also, as to the construction given by the highest court of the state to words in a deed or will, etc. Jackson v. Chew, 12 Wheat. 153; Waring v. Jackson, 1 Pet. 569; Henderson v. Griffin, 5 Pet. 151; Burgess v. Seligman, 107 U. S. 20, 33, 2 Sup. Ct. 10; Barber v. Railway Co., 166 U. S. 83, 99, 17 Sup. Ct. 488.

In Nichols v. Levy, 5 Wall. 433, 444, the supreme court of Tennessee, interpreting a statute of that state, had decided that such statute embraced trusts of the nature then under investigation, and that the same exempted the property embraced in the trust from liability to certain creditors. The supreme court of the United States followed such construction, and sustained the trust, but declared that, if decided by them on general principles of jurisprudence, and without regard to the state construction, they must necessarily have given a contrary decision. "Being a local statute, and involving a rule of property, we adopt the construction which has been given to it by the highest judicial tribunal of the state."

The decision reached by the supreme court of Iowa in Independent Dist. v. King, 80 Iowa, 497, 45 N. W. 908, is based primarily on a statute of that state (Code 1873, § 1747) requiring the school treasurer to hold all money belonging to the district. and pay out the same only on orders drawn, signed, and countersigned, as by statute directed. By various decisions of that court, such treasurer was held responsible for the moneys officially coming into his hands, even though it was stolen (District Tp. v. Morton, 37 Iowa, 551); or destroyed by fire (District Tp. v. Smith, 39 Iowa, 10); or lost in a bank, where he had deposited it (District Tp. v. Hardinbrook, 40 Iowa, 130). Following this general line of settled decisions in Iowa, under the statute quoted, the supreme court of that state (Independent Dist. v. King, 80 Iowa, 500, 45 N. W. 909) decide that:

"When [the school treasurer] made the deposits in question, he had no title to the money, excepting that acquired by virtue of his office as treasurer, and no right to part with that title by making a general deposit. The [bank officials] were fully advised as to the material facts, and therefore could acquire

no title to the deposit adverse to the [school district, whose funds were so deposited]. As to them, the money constituted a trust fund, which they had no right to convert to their own use; and the fact that they mingled it with other money, so that the identity of that deposited was lost, would not destroy the trust character of the deposits, nor prevent the enforcement of the trust against property to which they had contributed."

Without special reference to the cases, it may be said that the same general doctrine above considered is applied by the federal courts to suits to set aside conveyances, whether of real or personal property, as fraudulent, and of the rights of the parties thereunder; and there appears the same application, whether the action be at law or equity. The imperative reasons for this adoption of settled state construction readily appear. The two courts, operating within the same territory, with concurrent jurisdiction in the matters to be determined, ought not to engage in unseemly conflict. Though operating on different planes, unless there be some rule which can be properly applied, such conflict is inevitable. The opinion in Suydam v. Williamson, supra, quotes the following pertinent suggestions from Beauregard v. New Orleans, 18 How. 497:

"The constitution of this court requires it to follow the laws of the several states wherever they properly apply; and the habit of this court has been to defer to the decisions of their judicial tribunals upon questions arising out of the common law of the state, especially when applied to the title to lands. Upon cases like the present, the relation of the courts of the United States to a state is the same as that of her own tribunals. They administer the laws of the state, and, to fulfill that duty, they must find them as they exist in the habits of the people, and in the exposition of their constituted authorities. Without this, the peculiar organization of the judicial tribunals of the states and the Union would be productive of the greatest mischief and confusion."

Apply to the case at bar these suggestions. If defendant's contention is correct, then this court, sitting in Iowa, must, on the same state of facts, arrive at a contrary decision from that to which a state court of concurrent jurisdiction must arrive. A nonresident plaintiff, bringing his suit in this court against the receiver of a bank organized under the state law, would be denied decree, and his claim declared not preferential, and compelled to share with the general creditors; while a citizen of the state, not permitted to bring his action in this court, would, by the state court, acting under the decisions of the supreme court of the state, be granted decree, although he had deposited his funds in the same bank, and under the same circumstances as did the nonresident depositor. So, too, the same substantial facts presented against the receiver of a national bank, who could remove the suit to this court, would bring denial for a preferential claim to the depositor, while such facts, if presented in the state court against the receiver of a state bank in the same city even, would secure a preferential claim. In the absence of any statutory provision in the national bank act and its supplemental legislation, I would hesitate to so determine this case as to place the decision of this court in direct conflict with the settled adjudications of the supreme court of this state, in this matter. There seems involved such a rule of property, and the results of such conflicting decisions of federal and state courts would be so greatly to be regretted, that it appears to be the safer and wiser course to accept as the law of this case the decisions of

the state court. As a matter submitted for my sole determination, without action of the state court thereon, I would be strongly inclined to deny that a preferential claim exists in the case at bar, and believe this would accord with the stronger current of authority; but, for reasons above outlined, and supported in this conclusion by the cases above cited, authorizing me to follow the supreme court of the state wherein their decisions constitute a rule of property within the state, I find herein for the plaintiff, and that it is entitled to decree herein sustaining its preferential claim for the balance shown to be due it from the defendant receiver. Let decree be entered accordingly, with costs.